UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| FREDRIC A. GUENTHER, an individual; and WALTON FUJIMOTO, an individual, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | NO. |
| v. | COMPLAINT |
| BP RETIREMENT ACCUMULATION PLAN, by its Plan Administrator, the Senior Vice President of Human Resources of BP CORPORATION NORTH AMERICA INC.; and BP CORPORATION NORTH AMERICA INC., a corporation, | |
| Defendants. | |

**COMPLAINT**

Plaintiffs, Fredric A. "Fritz" Guenther and Walton "Walt" Fujimoto, allege:

**I. NATURE OF THE ACTION**

1.      Plaintiffs bring this class action against the BP Retirement Accumulation Plan ("RAP") and BP Corporation North America Inc. ("BP") under Section 502(a)(3) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132 (a)(3), and ERISA section 502(a)(1)(A), 29 U.S.C. § 1132(a)(1)(A), on behalf of certain participants and

COMPLAINT - 1

MERRICK, HOFSTEDT & LINDSEY, P.S.
ATTORNEYS AT LAW
3101 WESTERN AVENUE, SUITE 200
SEATTLE, WASHINGTON 98121
(206) 682-0610

beneficiaries of the BP Plan.  These participants and beneficiaries include approximately 450 or more former Standard Oil of Ohio ("Sohio") employees who, on September 19, 2014, were notified by BP's Ombudsman, retired United States District Court Judge Stanley Sporkin, that after an extensive investigation over a period exceeding three years, BP had rejected his recommendation that BP correct the disparity between (1) the retirement benefits BP promised former Sohio employees after acquiring their employer, and (2) the benefits BP's retirement plan administrator calculates are due under BP's modified benefits formula.

## II.        JURISDICTION AND VENUE

2.      This Court has exclusive subject matter jurisdiction over this matter under 28 U.S.C. § 1331 and ERISA § 502(e)(1), (f), 29 U.S.C. § 1132(e)(1), (f), and ERISA § 502(c), 29 U.S.C. § 1132(c).  Venue is proper, and this court has personal jurisdiction over the Defendants, under ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), and ERISA § 502(c), 29 U.S.C. § 1132(c).  The Plan is administered in this district and one or more of the Defendants resides or transacts business throughout this district.

## III.        THE PARTIES

### A.        Plaintiffs

3.      Plaintiff, Frederic "Fritz" A. Guenther ("Guenther"), is a resident of Washington State. Guenther was employed by Sohio commencing in 1979, and has worked for BP since BP acquired Sohio in 1987.

4.      Plaintiff Walton "Walt" Fujimoto ("Fujimoto") is a resident of Arizona.  He was employed by Sohio and worked for BP after it acquired Sohio.  Fujimoto retired from BP in 2014 after 37 years of service to BP and Sohio.

5.      Plaintiffs Guenther and Fujimoto have been participants and/or beneficiaries, within the meaning of ERISA § 3(7), (8), 29 U.S.C. § 1002(7), (8), in the defined benefit plans sponsored by BP and Sohio. Plaintiffs accrued benefits under the plan's final average pay formula and BP

COMPLAINT - 2

MERRICK, HOFSTEDT & LINDSEY, P.S.
ATTORNEYS AT LAW
3101 WESTERN AVENUE, SUITE 200
SEATTLE, WASHINGTON  98121
(206) 682-0610

promised them additional benefits.  BP's actions subjected Plaintiffs' pension benefit accruals to the RAP's cash balance accrual formula.

**B.      Defendants**

6.      Defendant BP is a subsidiary of BP plc, and was the plan sponsor of the Sohio defined benefit plan and the BP America Retirement Plan ("ARP").  BP is the plan sponsor of the BP Retirement Accumulation Plan ("RAP"), within the meaning of ERISA § 3(16)(B), 29 U.S.C. § 1002(16)(B).

7.      Defendant BP RAP is an employee pension benefit plan, within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A), and is a defined benefit plan within the meaning of ERISA § 3(35), 29 U.S.C. § 1002(35).  It is successor to and a continuation of the Sohio defined benefit plan and the BP America Retirement Plan, and has the duties and obligations of the BP America Retirement Plan as it existed on and before January 1, 1989, including any required communications that were delayed past that date or never made.  BP's Senior Vice President of Human Resources is the Plan Administrator, within the meaning of ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A), a plan fiduciary within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), and its Senior Vice President-Finance and Control, is a named fiduciary within the meaning of ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).   The BP RAP's Summary Plan Description lists its Plan Administrator as Director, Retirement Plans, Western Hemisphere, BP Corporation North America, Inc.  Upon information and belief, Clifford York holds that position. Through this arrangement, BP acts as the plan sponsor, plan administrator and a plan fiduciary, and controls the named fiduciary.  When BP as employer communicated with Plan Participants about plan changes and benefits, it acted as an ERISA fiduciary.

## IV.      FACTS SUPPORTING CLAIMS

**A.      Plaintiffs were employed by Standard Oil of Ohio and were participants in its defined benefit retirement plan.**

8.      Guenther and Fujimoto were employees of Sohio before 1987.

COMPLAINT - 3

MERRICK, HOFSTEDT & LINDSEY, P.S.
ATTORNEYS AT LAW
3101 WESTERN AVENUE, SUITE 200
SEATTLE, WASHINGTON  98121
(206) 682-0610

9.     While employed by Sohio, Guenther and Fujimoto were participants in a defined benefit retirement plan sponsored by Sohio.

### B. BP acquired Sohio and continued its traditional defined benefit plan as the BP America Retirement Plan.

10.    In a traditional defined benefit plan, a participant's accrued benefit is expressed as a defined benefit amount that a participant will receive each year after the participant retires.  In a defined benefit plan, the employee has the right to receive specified future benefits according to a formula.  The employer provides periodic funding that is sufficient, in the opinion of licensed actuaries, to provide funds to pay the specified benefits as they become due.  The plan administrator invests the funds, and the investment returns help fund the benefits paid to participants. Favorable investment returns operate to reduce the employer's cost of funding the pension benefits. The employer bears the risk that investment returns could be greater or less than expected.  Defined benefit plans allow an employer to fund a smaller portion of the future pension obligation, leaving more working capital available for the employer's operations than if the employer fully funded the future pension obligation.  By changing certain features of a defined benefit plan to resemble features of a defined contribution plan, while retaining the status of a defined benefit plan, the employer can continue to use more funds for working capital in its business operations than if it offered a defined contribution plan with similar expected benefits.

11.    A traditional defined benefit plan may pay accrued benefits in a lump sum, rather than over time as an annuity.  In doing so, that plan will calculate the lump sum benefit by estimating the present value of the future benefits to be paid during a participant's retirement.

12.    Traditional defined benefit plans apply assumptions to calculate the present value of the future pension payments, including assumptions regarding the life expectancy of the participant and salary growth.  When calculating present value, traditional defined benefit plans also assume a reasonable interest rate used to discount the value of future benefit payments.

COMPLAINT - 4

13.     Interest rate discounting used in calculating the lump sum present value of future payments considers the "time value of money." The "time value of money" recognizes that a lower amount paid today may be worth the same to an individual as a higher amount paid in the future.   Investment returns will enable the lower amount paid today to grow to the higher amount.  The lower amount paid today is the "present value" of a higher amount that would be paid in the future.

14.     The interest rate used as an assumption for annual investment rates of return has an inverse effect on present value calculations. The higher the interest rate used to discount a future payment, or a stream of payments, the lower the present value.  A small increase in the interest rate used to discount future payments will significantly decrease the present value.

15.     ERISA and the Internal Revenue Code contain parallel provisions that protect the value of participants' accrued benefits when determined as a lump sum, rather than an annuity.

16.     ERISA and the Internal Revenue Code provide that "if an employee's accrued benefit is to be determined as an amount other than an annual benefit commencing at normal retirement age . . . the employee's accrued benefit . . . shall be the actuarial equivalent of such benefit . . . ." ERISA § 204(c)(3), 29 U.S.C. § 1054(c)(3); IRC § 411(c)(3).

17.     ERISA and the Internal Revenue Code prohibit plans from containing provisions that cause accrued benefits to be forfeitable before normal retirement age. ERISA § 203(a), 29 U.S.C. § 1053(a); IRC § 411(a). Under applicable IRS rules, adjustments to plan benefits "in excess of reasonable actuarial reductions can result in rights being forfeited." Treas. Reg. § 1.411(a)-4T; *see also* Treas. Reg. § 1.401(a)-11(b)(2).

18.     The "anti-cutback" rule under ERISA and the Internal Revenue Code prohibits pension plans from adopting amendments that would decrease a benefit that has already been accrued by a participant. ERISA § 204(g), 29 U.S.C. § 1054(g); IRC § 411(d)(6).

19.     Congress mandated in ERISA § 204(h), as in effect in 1989, that a plan sponsor's attempt to amend a defined benefit plan which significantly reduces the rate of future benefit accrual or

COMPLAINT - 5

that eliminates or significantly reduces an early retirement benefit is ineffective when the plan administrator does not provide sufficient advance notice of the amendment.

20.     BP acquired Sohio in 1987, and made it the cornerstone of its United States operation, BP America.  BP continued to sponsor the Sohio defined benefit plan.  The Plan Administrator was based in Cleveland, Ohio.  The employer's contributions to the plan were held in trust in New York, New York.  The Plan's main office was relocated to Warrenville, Illinois, and currently has its office in Houston, Texas. The Plan trustee is located in New York, New York.

21.     Effective January 1, 1988, BP America Inc. merged the Sohio plan and several other subsidiary companies' defined benefit plans into a new plan called the BP America Retirement Plan ("ARP").  BP did not notify participants of substantive changes to the Sohio plan's benefit formula or definitions made in connection with restating and amending the plan.

22.     BP performed the dual role of both plan sponsor and plan administrator.

23.     BP retained the Sohio plan's defined benefit formula, which was a "final average pay" formula, for the employees who had been participants in the Sohio defined benefit plan. The final average pay formula accrued benefits as a percentage of pay for each year of service.   The annual amount of a participant's normal retirement benefit was calculated by multiplying the number of years of benefit service by 1.7% for years and months worked prior to July 1, 1971, and 1.6% percent of final average earnings for years and months worked after July 1, 1971, and reducing the sum by a portion of the participant's expected social security benefit.

24.     BP designated its Vice President-Human Resources to serve as Plan Administrator and its Senior Vice President- Finance and Control to serve as Named Fiduciary.

25.     BP decided to change the Sohio defined benefit plan for multiple reasons.  BP acquired other U.S. companies in addition to Sohio, and decided that greater uniformity among the plans sponsored by these subsidiaries would be beneficial.  The existing plan accrued benefits at a lower rate at the start of a career and then increased accruals significantly as the employee approached retirement age.  This rewarded career employees for remaining with the company,

COMPLAINT - 6

but it did not attract new, younger employees. BP expected to attract new and younger employees with a pension plan offering a more linear rate of accrual and benefits that were more portable than the existing Sohio plan. The new BP RAP had features that resembled a defined contribution plan from the perspective of an employee, but retained the advantages to the employer of a defined benefit plan. These benefits included the ability to control more working capital for BP's operations and the ability to use returns on invested employer fund contributions to reduce overall pension expenses. Legislative changes also encouraged BP to make changes to the Sohio plan in order to retain the tax advantages of a qualified pension plan.

### C.   BP converted the BP America Retirement Plan (a continuation of the Sohio traditional defined benefit plan) to a cash balance plan.

26.   Cash balance formulas are premised upon accruing a pension evenly over the course of an employee's career, with interest credits compensating for the diminishing value of a dollar over time. In contrast, the final average pay formula accrued the bulk of the pension benefits toward the end of the employee's career, encouraging long-term employment.

27.   Although they are defined benefit plans, cash balance plans appear similar to defined contribution plans (*e.g.*, individual-account plans like 401(k) plans) because cash balance plans express accrued benefits as account balances in hypothetical plan accounts established for each participant. Cash balance plans create a benefit structure that simulates that of defined contribution plans, but employers do not deposit funds in individual participant accounts. As with other defined benefit plans, employers bear the market risks and retain the benefit of favorable market performance. Despite any similarities a cash balance plan might bear to a defined contribution plan, a cash balance plan is considered a defined benefit plan for purposes of ERISA. This is because the individual accounts and contributions under the plan are "notional" and exist merely for purposes of record keeping, and cash balance plans guarantee participants a defined benefit at retirement, determined by the plan's benefit formula.

COMPLAINT - 7

MERRICK, HOFSTEDT & LINDSEY, P.S.
ATTORNEYS AT LAW
3101 WESTERN AVENUE, SUITE 200
SEATTLE, WASHINGTON 98121
(206) 682-0610

28.     Although cash balance plans, including the RAP, establish hypothetical accounts, they are not defined contribution plans within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34). Rather, cash balance plans like the RAP are defined benefit plans within the meaning of ERISA § 3(35), 29 U.S.C. § 1002(35).  Like other defined benefit plans, the employees' hypothetical cash accounts are reflected by balance sheet (liability) obligations of the sponsoring company and such reserves as may support those obligations under generally accepted accounting principles, governing statutes, or collective bargaining agreements.  Unlike defined contribution plans, cash balance plans allow employers to fully fund a smaller portion of the future pension obligation, leaving more working capital available than if the employer fully funded the future pension obligation.  By continuing to operate a defined benefit plan rather than changing to a defined contribution plan, BP could continue to fund only part of its pension obligation by accruing a liability to the pension fund, enabling it to reduce the amount BP borrowed through sale of its corporate bonds.

29.     Traditional defined benefit plans express accrued benefits as an annuity – *i.e.*, as annual retirement plan payments payable to the participant commencing upon retirement.  A defined benefit plan converted to a cash balance plan typically converts the annual accrued benefits earned under the plan's traditional formula and payable to a participant upon retirement into a single lump sum.   The plan then credits the participant's hypothetical "opening account" for the lump sum based on a "present value" calculation.

30.     Each cash balance plan participant accrues additional plan benefits in the plan through credits to his or her account. Cash balance plans credit each participant with a "pay credit" – a percentage of the participant's compensation – and with an "interest credit" – an amount determined by applying an interest rate to the account balance. Pay credits and interest credits comprise the additional accruals that participants earn in a typical cash balance plan. When the rate at which pay credits are accrued under the cash balance plan decreases, the benefit accrued will decrease. When the rate at which interest credits are accrued under the cash balance plan

COMPLAINT - 8

MERRICK, HOFSTEDT & LINDSEY, P.S.
ATTORNEYS AT LAW
3101 WESTERN AVENUE, SUITE 200
SEATTLE, WASHINGTON  98121
(206) 682-0610

decreases, the benefit accrued will also decrease.  When the sum of pay-credits and interest-credits provide the RAP participant benefits that are less than the benefits available under the final average pay formula, the benefits under the RAP will not be as good as or better than the benefits calculated under the final average pay formula. Unless the employer adds another credit to a participant's hypothetical account to make up the difference, the rate of accrual in the cash balance plan will have been significantly reduced from the rate of accrual under the traditional plan's formula.

31.     The conversion of a final average pay plan to a cash balance plan typically freezes the growth of benefit accruals, and converts the value of the earned pension benefit to a cash-out amount.  That amount or "account," if a worker is not yet ready to retire, is increased by monthly credits based on a percentage of the employee's compensation for that year.  The result is a significantly lower rate of accrual, and in most cases, a lower total pension benefit than under the original final average pay formula.

32.     If an employee initially accumulates earned benefits under a final average pay formula which is later changed to a cash balance formula, that employee is likely to accrue a significantly lower retirement benefit. The result of a change from a final average pay formula to a cash balance formula is a significant reduction in the rate of future benefit accruals.

33.     Shortly after converting the original Sohio retirement plan to the BP ARP, BP management decided to amend the plan's benefit formula from a final average pay formula to a cash balance formula.

34.     In deciding to convert to a cash balance plan, BP and the BP Plan Administrator gathered information about how such a conversion might affect benefits.  BP recognized at the time of conversion that, on average, its employees retired at age 60.

35.     In a letter dated August 26, 1988, BP's consulting actuary notified BP that some participants would retire with lower benefits under the cash balance plan than they would under

COMPLAINT - 9

MERRICK, HOFSTEDT & LINDSEY, P.S.
ATTORNEYS AT LAW
3101 WESTERN AVENUE, SUITE 200
SEATTLE, WASHINGTON  98121
(206) 682-0610

the final average pay formula, even though the "average" of benefits provided by the two plans might be similar.

36.    On January 1, 1989, BP converted the BP ARP (which included the former Sohio defined benefit retirement plan) to a cash balance plan, and named it the BP America Retirement Accumulation Plan ("RAP").  BP did not immediately inform its employees of this change.  In June 1989, BP informed its employees after-the-fact that, effective January 1, 1989, the BP ARP had been merged into the BP RAP and had been converted to a cash balance plan.

37.    BP told employees that the conversion would not affect the amount, timing, or form of payment of any benefit provided by the prior plan.

> **D.    BP failed to give timely and sufficient notice about the plan conversion; the information BP provided about the plan conversion misrepresented the benefits the RAP was expected to provide at retirement.**

38.    BP knew, or should have known, that its conversion from a final average pay formula to a cash balance formula risked a significant reduction in the rate of future benefit accruals for career employees.

39.    BP and the BP Plan Administrator exercised discretionary authority over the Plan and controlled the information the Plan Administrator provided to participants regarding the change in benefit formulas.

40.    BP and the BP Plan Administrator developed a communication campaign designed to: 1) promote employee acceptance of the change; 2) reduce employee concerns and inquiries; and 3) prevent opposition in order to guard against employee attrition and discontent due to the change. BP disclosed only information that portrayed the conversion favorably.  BP and the BP Plan Administrator led participants to believe the plan change was in the participants' best interest and that they should not be concerned the change would reduce pension benefits.  BP and the BP Plan Administrator sought to retain employees by assuring them if they continued employment with BP they could "count on" the future pension benefits under the RAP, and that these benefits

COMPLAINT - 10

MERRICK, HOFSTEDT & LINDSEY, P.S.
ATTORNEYS AT LAW
3101 WESTERN AVENUE, SUITE 200
SEATTLE, WASHINGTON  98121
(206) 682-0610

1   were "comparable to-and, in most cases, better than" their prior benefits available under the BP

2   ARP.

3   41.     As part of its campaign to promote employee acceptance of the RAP, BP hosted meetings

4   with employees where it told employees that the conversion to the RAP would make them

5   "much better off" than under the old plan.  BP intended that employees share this information to

6   promote employee acceptance of the change to the RAP.

7   42.     When BP announced to its employees that it had converted the BP ARP to the BP RAP,

8   BP told its employees that: (1) it had preserved the principal strengths of the BP ARP; (2) BP

9   would continue to pay the full cost to maintain the plan benefits;  and (3) the changes to the plan

10   were designed to provide a retirement benefit that was comparable to - and, in most cases, better

11   than - the benefit they would have received under the prior pension formula.  BP represented that

12   while the RAP would make long-term pension costs more stable and predictable for BP, its

13   principal motivation for the change was to obtain greater value by providing employees a more

14   flexible program that better fit their expectations and needs. BP also told employees the RAP

15   conversion was not a cost cutting exercise.  BP failed to disclose that while it hoped the RAP

16   would not increase its pension cost, the RAP was designed to reduce the cost to BP of being able

17   to offer pension benefits that were more portable and more attractive to younger employees.  BP

18   did not disclose that the cost of making pension benefits portable was shifted to career

19   employees, whose benefits were significantly reduced under the RAP.   BP also did not disclose

20   that the cash balance plan amendments to the defined benefit plan enabled BP to portray the

21   plan's benefits as individual accounts without bearing the cost of actually providing individual

22   accounts through a defined contribution plan, cutting BP's cost of offering retirement benefits

23   that appeared like those provided by an individual-account plan.  BP reduced expenses and

24   preserved cash liquidity by smoothing benefit accruals.

25   43.     Statements by BP and the Plan Administrator to plan participants regarding the changes

26   included:

COMPLAINT - 11

MERRICK, HOFSTEDT & LINDSEY, P.S.
ATTORNEYS AT LAW
3101 WESTERN AVENUE, SUITE 200
SEATTLE, WASHINGTON  98121
(206) 682-0610

- Your BP America pension plan was revised and renamed as of January 1, 1989. …   Your pension benefit will continue to be fully supported by contributions from the Company.  This means that BP America – not you – bears all the risk associated with investments in the Plan.

- The plan is designed to provide a retirement benefit that is comparable to – and, in most cases, better than – the benefit you would have received under the prior pension formula…..Simply put, the BP America Retirement Accumulation Plan is an innovative pension plan that provides retirement benefits participants can count on. …

- The enclosed brochure highlights the principal changes; ….  BP America pays the full cost.  BP America is responsible for funding, and bears the full investment risk.  And the plan provides a retirement benefit to career employees that is comparable to the fully competitive benefit under the prior formula.

- Answering your Questions:
  …
  In general, how do benefits under the Retirement Accumulation Plan compare with prior benefits?  Overall, the Retirement Accumulation Plan provides better retirement benefits than those previously available.

44.    BP and the BP Plan Administrator did not disclose that some participants would accrue benefits at a significantly reduced rate due to the conversion to the RAP, or at a minimum, that many participants faced a risk of such reductions.  BP's statements and nondisclosures assured participants that the plan amendments would not "provide for a significant reduction in the rate of future benefit accrual," as described in 29 U.S.C. § 1054(h)(1).  To employees, the accuracy of BP's assurances was bolstered by the fact that BP did not warn employees that there was a risk of a significant reduction in future benefits accruals, as ERISA § 204(h) required if such a reduction were being put into effect.

45.    BP intended these misleading statements to ease its transition into what it knew was a retirement program that was less favorable to certain employees.  BP and the Plan Administrator intended that plan participants would believe their misleading statements and rely on their truthfulness.  In stating that BP America, and not the participant, would bear the risk associated with the plan conversion, BP intentionally misled plan participants.

COMPLAINT - 12

MERRICK, HOFSTEDT & LINDSEY, P.S.
ATTORNEYS AT LAW
3101 WESTERN AVENUE, SUITE 200
SEATTLE, WASHINGTON  98121
(206) 682-0610

46.     BP represented that the RAP conversion was not a cost cutting exercise.  However, BP and the Plan Administrator failed to disclose that the RAP formula reduced the risk that its unfunded pension liability would increase in a volatile market, while at the same time increasing the degree that BP would benefit from invested employer contributions in a favorable market. BP failed to inform its employees that the RAP's formula limited the amount that plan benefits would increase in a favorable investment market compared to the prior plan or that the RAP would shift more risk to employees in a volatile market.   As BP recently acknowledged, "Clearly, it is impossible to know in advance how interest rates and salary growth will change over time."  Yet, BP's assurances to participants in 1989 did not inform them that the conversion shifted the risk of salary growth and interest rate volatility to plan participants while at the same time shifting the potential benefits of interest rate and market volatility to BP.

47.     BP and the Plan Administrator failed to disclose to Plan Participants that they had shifted the cost of BP's promised pension benefit portability under the RAP to career employees in the form of reduced benefit accruals.  Contrary to BP and the Plan Administrator's representations, the RAP was not designed to provide a retirement benefit comparable to – and, in most cases, better than – the benefit the career employees would have received under the Retirement Plan's prior formula.  The RAP did not provide career employees better retirement benefits than those previously available.

48.     BP's recent statements about the RAP conversion have been contradictory and confusing. BP and the Plan Administrator have continued to claim that the RAP provides as good or better benefits than the ARP.  BP and the Plan Administrator have recently asserted that any decrease in benefits for certain participants have been de minimis.   At the same time BP admitted in recent correspondence that the RAP benefits are not as great as the lump sum equivalent of the benefits the ARP provided.

COMPLAINT - 13

MERRICK, HOFSTEDT & LINDSEY, P.S.
ATTORNEYS AT LAW
3101 WESTERN AVENUE, SUITE 200
SEATTLE, WASHINGTON  98121
(206) 682-0610

49.     Under ERISA, when BP communicated about the participant's future ERISA plan benefits, BP and the Plan Administrator had a fiduciary duty, as well as a non-fiduciary legal duty, to refrain from misrepresentations.  ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1).

50.     One of ERISA's central goals is to enable plan beneficiaries to learn their rights and obligations at any time, and this notice requirement was intended to advance that goal.  ERISA § 204(h)(1), 29 U.S.C. § 1054(h)(1), provided that a defined benefit plan such as the BP ARP "may not be amended so as to provide for a significant reduction in the rate of future benefit accrual, unless, after adoption of the plan amendment and not less than 15 days before the effective date of the plan amendment, the plan administrator provides a written notice, setting forth the plan amendment and its effective date, to (A) each participant in the plan, (B) each beneficiary who is an alternate payee … under an applicable qualified domestic relations order …, and (C) each employee organization representing participants in the plan…."  Public Law 99-272, sec. 11006(a), 100 Stat. 243-244, (added to ERISA through the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"), enacted April 7, 1986).

51.     BP and the Plan Administrator did not provide BP ARP participants advance notice of the conversion to the RAP as required by ERISA § 204(h).  Plan participants received communications from BP and the Plan Administrator in June 1989 stating that, effective January 1, 1989, their defined benefit retirement plan had been converted to a cash balance plan.  BP and the Plan Administrator did not provide notice of the plan amendments before their January 1, 1989 effective date.

       **E.     When converting the ARP to the RAP, BP reduced the present value of opening balances by using an unreasonably high interest rate to calculate the present value of opening balances, and by calculating the opening balances retroactively.**

52.     Under the RAP, BP established an Opening Account and a Current Account retroactively to January 1, 1989, for each participant who continued to participate in the RAP.   BP assured

COMPLAINT - 14

participants their Opening Accounts equaled the lump sum present value of any benefits converted from the BP America Retirement Plan.

53.     During the cash balance conversion, the RAP reduced the accrued benefits that participants had already earned in the BP ARP by calculating the present value of the accrued benefit as though the formula change had been made before January 1, 1989, and by using an interest rate (8%) to calculate the present value of the accrued benefits that was higher than an appropriate interest rate. Consequently, the Opening Account balance reduced participants' accrued benefits.  The vested benefit due at retirement was not preserved by the method BP used of establishing opening account balances because those accounts did not provide the same amount due under the final average pay formula as calculated upon actual retirement using the appropriate treasury department interest rate.

### F.     BP's performance representations were not met.

54.     BP's predictions about future market interest rates being at or above 8% were unreasonable.  BP knew or reasonably should have known that the RAP conversion put its employees at risk of a significant reduction in future benefit accruals due in part to interest rate volatility, which in fact occurred.  Projected pension benefits for former Sohio employees who remained employed by BP for many years after BP converted the BP ARP to the RAP are significantly lower than the benefits BP told employees they could count on when they retired. And, the benefits provided by the portion of participants' accounts that represents the Opening Balance BP established in 1989 are less than the benefits participants had accrued as of the conversion date under the final average pay formula that would become due upon retirement.

### G.     BP adjusted the RAP to protect benefits for certain former Sohio employees.

55.     When retirement benefits for former Sohio "career employees" failed to accrue in a manner at least equal to benefits calculated under the prior final average pay formula, BP adjusted pension benefits of some former Sohio Heritage Employees to "harmonize" BP's U.S.

COMPLAINT - 15

executive reward programs. BP provided those additional benefits under a Supplemental Executive Retirement Benefit Plan ("SERB"). BP only provided this benefit to Sohio Heritage Employees who were at a certain level (referred to as "Band D") or above between 2002 and 2011. BP did not offer this supplemental benefit to its "lower level" employees. Nor did BP inform "lower level" employees that such an adjustment was necessary to obtain the benefits BP had originally promised. By making this adjustment, BP acknowledged the benefits provided to "lower level" employees under the RAP were inferior to the benefits they would have received under the ARP.

56. As participants became concerned that the RAP's performance was lagging behind what BP had promised, Plaintiffs, as well as other plan participants, asked BP to explain and correct any disparity between (a) what they had been promised in 1989 when BP announced the RAP, and (b) what the Plan Administrator estimated their retirement benefits would actually be under the RAP.

**H.      BP's Code of Conduct assured employees that BP would keep its promises.**

57. BP maintained a "Code of Conduct" which set forth a commitment by BP to foster trust and reliance between the company and its employees, stating: "If something is not right, we will correct it" and "We aim to make sure everyone in BP and everyone we come into contact with is treated with fairness, respect and dignity, and is never unfairly discriminated against." BP's Code of Conduct assured BP employees it was reasonable to rely on BP's commitments, and to expect that BP would adjust the pension benefits to provide the level of benefits BP and the Plan Administrator described in the 1989 promotional announcements regarding conversion to the cash balance formula.

58. BP's conduct vis-à-vis other heritage groups suggested that BP had followed its Code of Conduct and honored its promises regarding RAP benefits. When BP recognized that other similarly situated heritage-employee groups (including but not limited to ARCO and AMOCO

COMPLAINT - 16

heritage groups) RAP benefits were less than BP had promised, BP enhanced benefit balances to remedy those plan-performance issues. BP enhanced benefits for these heritage-employee groups in accord with the Code of Conduct, and Plaintiffs reasonably believed that BP would do the same for the former Sohio pension participants.

59. BP asked Plaintiffs to address their concerns about the RAP through the BP Office of the Ombudsman. BP maintained the BP America Ombudsman Program to address worker disputes with BP and to resolve work place concerns. At the time, the program was led by Judge Stanley Sporkin (Retired, United States District Court, D.C.), who reported directly to John Mingé, Chairman and President of BP America.

60. BP urged Plaintiffs, and those similarly situated, to participate in the Ombudsman process and to file a complaint with the Office of the Ombudsman asking BP to remedy any inequity in the benefits. BP intended that plaintiffs would participate in this time-consuming and costly type of non-binding arbitration before resorting to litigation.

61. In 2011, approximately 450 former Sohio employees, including plaintiffs, filed a complaint with BP's Office of the Ombudsman raising concerns about their retirement benefits, and other concerns. After filing the complaint with the Office of the Ombudsman, BP's President, John Mingé actively encouraged Plaintiffs to rely on the BP Ombudsman process to address Sohio Heritage employees' concerns about the RAP, stating that the Ombudsman was fully aware of the details and that those in the Ombudsman's office were in the process of reviewing the issue. The Ombudsman review process lasted over three years.

62. President John Mingé later reported to Plaintiffs that during the subsequent three years of the Ombudsman process, the highest levels of BP executive management, including BP employees in its legal department, worked with the Office of the Ombudsman to analyze the allegations of the concerned BP/former Sohio employees. Former BP ARP participants were encouraged to participate in the process and await the Ombudsman's conclusions and BP's response to the Ombudsman's recommendations.

MERRICK, HOFSTEDT & LINDSEY, P.S.
ATTORNEYS AT LAW
3101 WESTERN AVENUE, SUITE 200
SEATTLE, WASHINGTON 98121
(206) 682-0610

63.     On March 21, 2014, Janet L. Weiss, Regional President of BP Alaska, responded to BP employees' concerns about how long the Ombudsman review was taking. She told Mr. Guenther the Ombudsman's office had recently provided Mr. Mingé a letter and report, and assured him "the matter is taken very seriously by John [Mingé] and everyone in BP who is involved, and in my opinion, we will likely have a decision on issues raised by the Ombudsman's office by June [2014].... Ms. Weiss urged Plaintiffs to allow "those in BP who are responsible for reviewing the Sohio matter"  "a chance to conduct their review as I believe the issues have been raised by the Ombudsman...."

64.     According to documents later produced by BP, during the review process the Ombudsman's Office reviewed numerous documents and submissions from former Sohio employees and from BP as part of its analysis.   Guenther, Fujimoto, and numerous other employees participated in this investigation and analysis by the Office of the Ombudsman.

65.     Judge Sporkin later described the materials reviewed by his office as follows:

> This matter has been under review and investigation for almost two years. It has required extensive research of historical data that has been difficult to collect and review. In addition, it required a financial review of relevant market and economic conditions and indicators, BP statements at the time, and a data assessment of comparable heritage retirement programs. Throughout the pendency of the case, increasing numbers of employees and former employees contacted our office, often raising new issues and providing additional information. Ultimately 16 separate and unique issues were identified for investigation.
>
> Since this matter required substantial data from BP's Legal Department and Benefits programs, there was a dialogue and review of the issues throughout the investigation process. In addition, interim dialogue, meetings and reviews were held with several members of the CI group with the most technical knowledge of the case. Numerous meetings and telephone conferences were held with concerned employees, updates were provided to the increasing number of concerned employees, and several personal meetings occurred between the Ombudsman and concerned employees.
>
> The draft report was reviewed with BP to determine that the factual data relied upon was accurate, and that our understanding of the program and its variances was correct. In the end there is little, if any, dispute over the relevant facts of the case and our recommendations stem from a consideration of these undisputed facts.

COMPLAINT - 18

MERRICK, HOFSTEDT & LINDSEY, P.S.
ATTORNEYS AT LAW
3101 WESTERN AVENUE, SUITE 200
SEATTLE, WASHINGTON 98121
(206) 682-0610

1   A copy of the Ombudsman's Report (without Exhibits listed on the report's page 31, but with

2   transmittal letter), is attached to this Complaint as **Exhibit "A"** and incorporated herein.

3   66.      As part of the dialogue between BP and the Ombudsman regarding the claim that BP's

4   conversion to the RAP ultimately caused a significant reduction in pension benefits, the Office of

5   the Ombudsman framed the inquiry to BP, in part, as follows:

> Issue 1:  The current values of SOHIO heritage individual retirement accounts are
> less than if BP had maintained the original pre-1989 SOHIO plan. This is not
> consistent with BP's statements that the plan would be "as good or better" than
> the previous retirement plan.
>
> Ombudsman Inquiry:
>
> In responding to this issue, please explain, in detail, the calculations of the
> SOHIO heritage individual retirement account using the model employee
> parameters included with these questions as Attachment A. (This is the same
> information that was provided in the April, 2013 e-mail from Garde [a
> representative of the Ombudsman's office] to Heller [a BP employee in its legal
> department.] Also, please identify any specific circumstances where a retiring
> SOHIO heritage employee's retirement income would be "as good or better" than
> the original SOHIO plan.

BP's response asserted that its interest rate assumptions were reasonable based on actuarial

assumptions and that the projections communicated to employees were accurate.  BP stated:

> …
>
> In the communication materials, BP indicated that the projections of future
> benefits were estimates based on assumptions and were not a promise of what the
> actual benefit under the plan ultimately would be.  Indeed, it would have been
> impossible to forecast exactly what a participant's cash balance benefit would be
> because the benefit depends on interest rates and other factors going forward.
> Clearly, it is impossible to know in advance how interest rates and salary growth
> will change over time.   BP's communications at the time used reasonable
> assumptions based on both then current and historical data.
>
> The new cash balance formula of Sohio employees generated a pension benefit
> that was generally greater than the final average pay benefit would have been at
> younger ages.  However, due to lower interest rates since 1989, the Sohio final
> average pay formula generally produces a greater lump sum benefit than the cash
> balance formula during the early retirement years (late 50s/early 60s).  The fact
> remains that Sohio employees have received a pension benefit that is consistent
> with both the governing plan terms and the formula described to them in the
> original communications.

BP's response to the Ombudsman's inquiries also asserted:

COMPLAINT - 19

MERRICK, HOFSTEDT & LINDSEY, P.S.
ATTORNEYS AT LAW
3101 WESTERN AVENUE, SUITE 200
SEATTLE, WASHINGTON  98121
(206) 682-0610

> [W]ith interest rates having subsequently dropped - to historic lows in recent years - the cash balance benefit now is not as great as the lump sum equivalent of the benefit the Sohio final average pay formula would have produced.  The fact remains, however, that Sohio employees have received a pension benefit that is consistent with both the governing plan terms and the formula described to them in the original communications.

> The historically low interest rates have further increased the difference between the cash balance account and the Sohio final average pay formula because the lower interest rates increase the lump sum equivalent of the monthly Sohio annuity.  It is important to bear in mind, though, that historically low interest rates in recent years do not mean that the communications in 1989, which spelled out precisely how the benefit would be calculated, were incorrect or misleading.

67.    On March 7, 2014, the BP Ombudsman substantiated the claims by the former Sohio plan participants affected by the RAP by way of a report submitted to BP management only.  The Ombudsman found:

> The current values of SOHIO heritage individual retirement accounts for current and recently retired employees are less than if BP had maintained the original SOHIO plan.  The outcome was not consistent with BP's statements at the time in the Plan's promotional material that the plan would be "as good or better" than the previous retirement plan, or that BP bore all the risks of the Plan.

68.    In response to BP's assertions that the low interest rate was a "historical anomaly" and that BP's 8% interest rate prediction was reasonable, the Ombudsman found that the opposite was true and that the, "8% interest rate turned out to be a high projection, based on an historical anomaly."

69.    The Ombudsman concluded that the original promotional material BP had its Plan Administrator provide to plan participants was overly optimistic about the future of interest rates and its impact on the RAP plan accumulations.  The Ombudsman found that the Treasury note forecasts during the relevant time predicted a "precipitous drop in interest rates…which is what occurred."  The Ombudsman also found:

> In addition, the new retirement plan presented certain risks. These risks included what would happen if the projected interest rates could not be sustained. This is what, in fact, occurred. The employees simply were not told that the risks associated with a decline in interest rates would be solely borne by the employees. Simply put, there would be no allocation of these risks.

COMPLAINT - 20

MERRICK, HOFSTEDT & LINDSEY, P.S.
ATTORNEYS AT LAW
3101 WESTERN AVENUE, SUITE 200
SEATTLE, WASHINGTON  98121
(206) 682-0610

70.     The Ombudsman recommended BP rectify the disparity between the benefits promised and the benefits provided by the RAP.  He stated that BP should determine the full retirement benefits that the affected individuals would have received under their prior Sohio retirement plan and offer the employees additional benefits to bridge the difference between what the Sohio plan would have paid them and the benefit calculated by the RAP.  The Ombudsman offered suggestions to BP about how to accomplish the above-described remedy and recommended that third party independent experts analyze and determine a payout methodology.

71.     Some BP America management employees recognized the Ombudsman's recommendation was consistent with BP's promises in 1989 and its assurances to employees through its code of conduct and treatment of other heritage-employee groups; they recommended that BP provide funding to the RAP and direct the Pension Administrator to increase the pension accounts of the affected former Sohio employees as recommended by the Ombudsman.

     **I.**    **BP broke faith with its career employees and repudiated BP's promise to provide retirement benefits they could count on to be comparable to the fully competitive benefit under the plan's prior formula.**

72.     On September 15, 2014, BP America President John Mingé wrote a letter communicating BP's "final decision" on the matter.  In a letter to BP employees, Mingé wrote that the issue had, "been the subject of extensive analysis on the part of BP and the Ombudsman over the past three years."  Mingé stated:

> With the Ombudsman's review and our assessment of the findings complete, we now communicate to you BP's final decision on the matter. . .
>
> After full cooperation with the Ombudsman's investigation and critical analysis of the matter at the highest levels of the company, we have decided to maintain our original position - changes will not be made to the SOHIO Heritage Pension Plan benefits.

This was the first formal communication from BP to the Sohio Group participating in the Ombudsman process.

73.     Mr. Mingé's letter, however, did not reveal to BP employees the Ombudsman's recommendation.  BP refused to discuss the Ombudsman's recommendations and findings with

COMPLAINT - 21

MERRICK, HOFSTEDT & LINDSEY, P.S.
ATTORNEYS AT LAW
3101 WESTERN AVENUE, SUITE 200
SEATTLE, WASHINGTON  98121
(206) 682-0610

participants.  His letter merely stated that the Ombudsman's review was complete and that BP had made a "final decision on the matter."

74.     On September 19, 2014, four days later, the Ombudsman wrote a letter to BP employees revealing for the first time that the Ombudsman had decided in the employees' favor and had recommended that BP correct the disparity between the promised benefits and the benefits under the RAP.  The Ombudsman wrote, "BP did not accept the Office of the Ombudsman's (OoO) recommendations to take action to address the heritage employee concerns."  The letter went on to express disappointment in BP's decision and that, "[u]ltimately, we believe in your position that you're due some relief as a consequence of the market impact on the accounts of so many of you providing long years of service to BP – on at least an equitable basis."  The Ombudsman attached a summary of its report to BP, and urged plan participants to review the issues with a personal attorney or advisor.  A copy of this letter and the summary report are attached as Exhibit B.

75.     On information and belief, this is the only occasion where BP failed to follow the recommendations of the Office of the Ombudsman.  BP recently discontinued the Office of the Ombudsman.

       **J.**    **Guenther filed an administrative claim with the RAP Plan Administrator and requested documents; BP withheld documents responsive to his requests.**

76.     After BP's final decision on the RAP pension issue, Mr. Guenther filed an administrative claim with the Plan Administrator requesting that the BP RAP provide him benefits "as good as or better than" his benefits calculated under the original Sohio defined benefit plan.

77.     During that claim process, Guenther requested that the Plan Administrator and BP provide information about the conversion of the BP ARP (which had assimilated the Sohio Plan) to the BP Retirement Accumulation Plan, as well as all historical data that was collected, reviewed, or made available during the protracted Ombudsman's analysis.

COMPLAINT - 22

78.     The Plan Administrator declined to provide most of the documents requested by Guenther.   Instead, Guenther received a letter from a Senior Attorney in BP's Labor, Employment & Employee Benefits Group containing BP's response to Mr. Guenther's document request.  The responses were incomplete and evasive.

79.     Guenther specifically asked BP to provide copies of all documents related to the RAP conversion prepared by Karen Salinaro (formerly with BP's consulting actuarial firm, Kwasha Lipton, which studied the plan options and advised BP in converting to the cash balance formula).   BP falsely reported that it had not identified any actuarial studies prepared in connection with the conversion of the ARP into the RAP.   BP's response stated,

> "Letter dated December 8, 1989 from Karen Salinaro to BP's Pension Plan Manager. Our review of the company's files identified no other documentation prepared by Karen Salinaro."

(Exhibit C (redacted to shield the identity of the responding attorney)).

80.     In fact, BP had in its possession an August 26, 1988 letter from Karen Salinaro to BP's Manager, Pension Plans (Elizabeth Rossman), referred to in paragraph 35; it was attached to BP's federal district court filing on January 29, 2010, in other litigation involving the RAP.  BP and its actuary expert discussed the letter and represented it to be authentic. (The letter and attachment were numbered in that litigation as BP00001388-1403.  A copy is attached as Exhibit D.)  In that letter, Ms. Salinaro advised BP that, even with the assumptions of 6% annual pay increases and 8% basic annual interest credits to the accounts, "some will be retiring with less than they would have under the final pay plan, some with more."  BP's court filings indicate it has additional related documents.

81.     BP withheld evidence that is material to Guenther's claims and would have supported Plaintiffs' claims.  BP knowingly withheld the August 26, 1988 letter and many additional documents responsive to Guenther's requests during the administrative claim process.

COMPLAINT - 23

MERRICK, HOFSTEDT & LINDSEY, P.S.
ATTORNEYS AT LAW
3101 WESTERN AVENUE, SUITE 200
SEATTLE, WASHINGTON  98121
(206) 682-0610

1

2

### K.   BP denied Guenther's administrative claim and his appeal and continued to withhold responsive documents requested by Guenther.

82.   The Plan Administrator denied Guenther's claim, and denied his assertion that the RAP accrued benefit was less than it would have been had the Sohio Plan final average pay formula been retained.   Consistent with the statements BP made repeatedly to employees beginning in 1989, the Plan Administrator maintained again that Plaintiff's projected benefit from the RAP was better than his projected benefit under the ARP, despite the fact that the Ombudsman studied similar representations by BP's legal department and found them untrue.

83.   The Plan Administrator's actions were fiduciary acts.   The Plan Administrator owed a special duty of loyalty to the plan beneficiaries, including Mr. Guenther and Mr. Fujimoto. However, the Plan Administrator's representative had a conflict of interest because she was employed by and represented BP, which funded the plan and evaluated administrative claims.

84.   Guenther appealed the Plan Administrator's decision to redetermine his accrued pension benefits.   Guenther again asked for document production and asked that the Appeal Administrator consider those additional materials.   The Appeal Administrator denied the bulk of Guenther's document requests, based in part on BP's false and misleading responses to document requests.   The Appeal Administrator denied Guenther's appeal on December 30, 2015.

85.   Because the Plan Administrator and the Appeals Administrator denied Guenther's document requests and his administrative claims it is reasonable to assume that administrative claims by similarly situated plan participants would be futile.

86.   Guenther and Fujimoto filed this cause of action on their own behalf and on behalf of similarly situated individuals.

### V.   CLASS ALLEGATIONS RELATED TO COUNTS 1, 3, 4, and 5
### Retroactive Opening Account Class

87.   Plaintiffs bring the claims for relief in Counts 1, 3, 4, and 5 as a class action under Rule 23 of the Federal Rules of Civil Procedure on behalf of a class of similarly situated employees who participated in the RAP and are former Sohio employees, whose pension plans have not

COMPLAINT - 24

1   been previously adjusted, and their beneficiaries, for whom an Opening Account was established

2   retroactively to January 1, 1989, even though they were not informed of the conversion until

3   June 1989 or later (**"Retroactive Opening Account Class"**).

4   88.   The requirements for maintaining this action as a class action under Rule 23(a) of the

5   Federal Rules of Civil Procedure are satisfied:

6   (a)   The members of each of the classes are so numerous that joinder of all members

7   is impracticable. The exact number of class members is not known to Plaintiffs.  Plaintiffs

8   believe that the number of class members, including active participants, participants and

9   beneficiaries receiving retirement benefits, and retired or separated participants who are entitled

10   to receive benefits in the future exceeds four-hundred-and-fifty people, and may exceed one

11   thousand.

12   (b)   There are questions of law and fact that are common to the Retroactive Opening

13   Account Class, including whether they were not informed until June 1989 that their plan had

14   been converted from the BP America Retirement Plan to the BP RAP, and whether that change

15   resulted in forfeiture of accrued benefits in violation of ERISA §§ 203(a) and 204(g), 29 U.S.C.

16   §§ 1053(a) and 1054(g).

17   (c)   Plaintiffs are members of the Retroactive Opening Account Class and their claims

18   are typical of the members of the class.

19   (d)   Plaintiffs will fairly and adequately protect the interests of the classes and have

20   retained counsel experienced in ERISA and class action litigation.  Plaintiffs have no interests

21   that are adverse or antagonistic to the interests of the Retroactive Opening Account Class.

22   89.   The requirements under Rule 23(b)(1), (b)(2), and (b)(3) of the Federal Rules of Civil

23   Procedure are satisfied:

24   (a)   The prosecution of separate actions by individual members of the Retroactive

25   Opening Account Class would create a risk of inconsistent adjudications that would establish

26   incompatible standards of conduct for the Defendants.  Alternatively, prosecution of separate

COMPLAINT - 25

actions by individual class members would create a risk of adjudications regarding individual members of the Retroactive Opening Account Class that would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications, or substantially impair or impede their ability to protect their interests, since ERISA authorizes participants to obtain relief that includes relief for the Plan as a whole;

(b)     The Defendants have acted and refused to act on grounds applicable to the Retroactive Opening Account Class, making appropriate final injunctive relief or corresponding declaratory relief regarding the Retroactive Opening Account Class as a whole;

(c)     The questions of law and fact that are common to the members of the Retroactive Opening Account Class predominate over questions affecting only individual members; and

(d)     A class action is superior to other available methods for the fair and efficient adjudication of the dispute:

(1)     The injuries suffered by many individual class members or their stake in the matter may be relatively small.  The cost and burden of litigation, which would likely be the same whether claims are brought by an individual plaintiff or on behalf of a class, may make it impossible for class members to individually seek relief for the Defendants' wrongful conduct.

(2)     The commonality of all legal and factual issues should make the class action easy to manage.

### VI.  CLASS ALLEGATIONS RELATED TO COUNTS 1, 2, 3, 4, and 5
#### Notice Class

90.     Plaintiffs bring the claims for relief in Counts 1, 2, 3, 4, and 5 as a class action under Rule 23 of the Federal Rules of Civil Procedure on behalf of a class of similarly situated individuals who participated in the BP RAP and are former Sohio employees, and their beneficiaries, who did not receive adequate notice of the plan conversion (**"Notice Class"**) as required by ERISA § 204(h) as set out in Public Law 99-272, sec. 11006(a), 100 Stat. 243-244.

COMPLAINT - 26

91.     The requirements for maintaining this action as a class action under Rule 23(a) of the Federal Rules of Civil Procedure are satisfied:

(a)     The members of each of the classes are so numerous that joinder of all members is impracticable. Although the exact number of class members is not known, Plaintiffs believe that the number of class members, including active participants, participants and beneficiaries receiving retirement benefits, and retired or separated participants entitled to receive benefits in the future exceeds four-hundred-and-fifty people, and may exceed one thousand.

(b)     There are questions of law and fact that are common to the Notice Class, including whether the notice of plan conversion was proper and timely under ERISA § 204(h) as set out in Public Law 99-272, sec. 11006(a), 100 Stat. 243-244; and whether lack of proper notice rendered BP's attempt at conversion ineffective and voidable by those participants whose benefits calculated by the RAP Administrator are not "as good as or better than" benefits provided under the traditional final average pay formula used by the BP America Retirement Plan.

(c)     Plaintiffs are members of the Notice Class and their claims are typical of the members of the class.

(d)     Plaintiffs will fairly and adequately protect the interests of the classes and have retained counsel experienced in ERISA and class action litigation.  Plaintiffs have no interest that is adverse or antagonistic to the interests of the Notice Class.

92.     The requirements under Rule 23(b)(1), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure are satisfied:

(a)     The prosecution of separate actions by individual members of the Notice Class would create a risk of inconsistent adjudications that would establish incompatible standards of conduct for the Defendants. Alternatively, prosecution of separate actions by individual class members would create a risk of adjudications regarding individual members of the Notice Class that would, as a practical matter, be dispositive of the interests of the other members not parties

COMPLAINT - 27

to the adjudications, or substantially impair or impede their ability to protect their interests, since ERISA authorizes participants to obtain relief that includes relief for the Plan as a whole;

(b)     The Defendants have acted and refused to act on grounds generally applicable to the Notice Class, making appropriate final injunctive relief or corresponding declaratory relief regarding the Notice Class as a whole;

(c)     The questions of law and fact that are common to the members of the Notice Class predominate over any questions affecting only individual members; and

(d)     A class action is superior to other available methods for the fair and efficient adjudication of the dispute:

(1)     The injuries suffered by many individual class members or their stake in the matter may be relatively small.  The cost and burden of litigation, which would likely be the same whether claims are brought by an individual plaintiff or on behalf of a class, may make it impossible for class members to individually seek relief for the Defendants' wrongful conduct.

(2)     The commonality of all legal and factual issues should make the class action easy to manage.

### VII.  CLASS ALLEGATIONS RELATED TO COUNTS 1, 4, and 5
#### Excessive Interest Rate Class

93.     Plaintiffs bring the claims for relief in Counts 1, 4, and 5 as a class action under Rule 23 of the Federal Rules of Civil Procedure on behalf of a class of similarly situated individuals who participated in the BP RAP and are former Sohio employees, and their beneficiaries, whose opening balances were calculated with actuarial assumptions that used an interest rate that was excessive and not appropriate under ERISA, resulting in rights to accrued benefits being forfeited, contrary to ERISA § 203(a), 29 U.S.C. § 1053(a), IRC § 411(a), and ERISA § 204(g), 29 U.S.C. § 1054(g), and IRC § 411(d)(6) (**"Excessive Interest Rate Class"**).

94.     The requirements for maintaining this action as a class action under Rule 23(a) of the Federal Rules of Civil Procedure are satisfied:

COMPLAINT - 28

MERRICK, HOFSTEDT & LINDSEY, P.S.
ATTORNEYS AT LAW
3101 WESTERN AVENUE, SUITE 200
SEATTLE, WASHINGTON  98121
(206) 682-0610

(a)     The members of each of the classes are so numerous that joinder of all members is impracticable.  Although the exact number of class members is not known, Plaintiffs believe that the number of class members, including active participants, participants and beneficiaries receiving retirement benefits, and retired or separated participants entitled to receive benefits in the future exceeds four-hundred-and-fifty people, and may exceed one thousand.

(b)     There are questions of law and fact that are common to the Excessive Interest Rate Class, including whether the interest rates used by BP to calculate the lump sum present value of accrued benefits when Opening Accounts were established were excessive under ERISA § 205(g), 29 U.S.C. § 1055(g), and caused the RAP to reduce accrued benefits in violation of ERISA §§ 203(a) and 204(g), 29 U.S.C. §§ 1053(a) and 1054(g).

(c)     Plaintiffs are members of the Excessive Interest Rate Class and their claims are typical of the members of the class.

(d)     Plaintiffs will fairly and adequately protect the interests of the classes and have retained counsel experienced in ERISA and class action litigation.  Plaintiffs have no interest that is adverse or antagonistic to the interests of the Excessive Interest Rate Class.

95.     The requirements under Rule 23(b)(1), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure are satisfied:

(a)     The prosecution of separate actions by individual members of the Excessive Interest Rate Class would create a risk of inconsistent adjudications that would establish incompatible standards of conduct for the Defendants. Alternatively, prosecution of separate actions by individual class members would create a risk of adjudications regarding individual members of the Excessive Interest Rate Class that would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications, or substantially impair or impede their ability to protect their interests, since ERISA authorizes participants to obtain relief that includes relief for the Plan as a whole;

COMPLAINT - 29

(b)     The Defendants have acted and refused to act on grounds generally applicable to the Excessive Interest Rate Class, thereby making appropriate final injunctive relief or corresponding declaratory relief regarding the Excessive Interest Rate Class as a whole;

(c)     The questions of law and fact that are common to the members of the Excessive Interest Rate Class predominate over any questions affecting only individual members; and

(d)     A class action is superior to other available methods for the fair and efficient adjudication of the dispute:

(1)     The injuries suffered by many individual class members or their stake in the matter may be relatively small.  The cost and burden of litigation, which would likely be the same whether claims are brought by an individual plaintiff or on behalf of a class, may make it impossible for class members to individually seek relief for the Defendants' wrongful conduct.

(2)     The commonality of all legal and factual issues should make the class action easy to manage.

## VIII.  CAUSES OF ACTION AND CLAIMS FOR RELIEF FOR ERISA AND PLAN VIOLATIONS

## COUNT 1

### BP's RAP CHANGES CAUSED UNLAWFUL FORFEITURES AND VIOLATED THE ANTI-CUTBACK RULE BY USING AN ARTIFICIALLY HIGH INTEREST RATE TO CALCULATE OPENING BALANCES AND BY ESTABLISHING OPENING BALANCES RETROACTIVELY

96.     Plaintiffs repeat and reallege the allegations in paragraphs 1 through 95 and assert this claim for equitable relief under ERISA §502(a)(3).

97.     For purposes of establishing the Opening Accounts, in determining the "lump sum present value" of the pension benefits that had accrued under the BP RAP Plan, BP applied an unlawful and unreasonable assumption that had the effect of reducing the accrued benefits that participants had already earned in the plans before January 1, 1989.

COMPLAINT - 30

MERRICK, HOFSTEDT & LINDSEY, P.S.
ATTORNEYS AT LAW
3101 WESTERN AVENUE, SUITE 200
SEATTLE, WASHINGTON  98121
(206) 682-0610

98.     In establishing the Opening Accounts as of January 1, 1989, the BP Plan used an interest rate of 8 percent to calculate the present value of the benefits that had accrued under the original Sohio Plan.  That interest rate exceeded the maximum interest rate permitted under ERISA and the Internal Revenue Code for determining lump sum present values.

99.     The maximum rate the BP Plan could have used under ERISA § 205(g)(3)(A)(i), 29 U.S.C. § 1055(g)(3)(A)(i), and under the Internal Revenue Code Section 417(e), to determine the present value of accrued benefits as of January 1, 1989 was less than 8%. The applicable PBGC rate as of January 1, 1989 was 7.75%. To calculate an opening balance that would be consistent with BP's representations at the time of the RAP conversion, BP should have used an interest rate significantly lower than 8%.  Moreover, by converting the accrued benefit due at retirement to an opening account balance calculated to discount the projected future payments to present value, without providing for supplementation if the calculation failed to provide fully the vested benefits when the participant actually retires, BP failed to protect the vested benefits.  The lump sum amount calculated in 1989, with subsequent interest credit accruals provided by the revised plan formula, has not provided the accrued defined benefit that the final average pay formula specified would be determined upon actual retirement.  That benefit would be stated in monthly payments, and if paid as a lump sum upon actual retirement, the amount would be determined by a present value calculation that used the treasury department interest rates in effect at retirement. BP's conversion process that used 1989 estimates to determine the accrued future benefit as a lump sum amount placed in the Opening Account failed to protect participants' actual accrued benefits determined at retirement.

100.    BP further artificially depleted the value of opening accounts by establishing the RAP Opening Accounts retroactively to a date that preceded the date participants ceased to participate in the BP ARP and had their hypothetical accounts converted to accounts in the RAP as of that earlier date. By establishing the Opening Accounts retroactively, BP caused participants to forfeit the accruals they had earned in the BP ARP defined benefit plan between the retroactive

COMPLAINT - 31

Opening Account date of January 1, 1989 and the date they were notified their pension account had been converted to a RAP account. BP delayed providing notice of the conversion until June 1989 or later.

101.     By using an inappropriately high interest rate and a retroactive date to establish Opening Accounts, and by failing to ensure the benefits participants had accrued as of the date they were notified their pension accounts had been converted to RAP accounts, BP caused forfeitures and reductions in benefit accruals, in violation of ERISA §§ 203(a) and 204(g), 29 U.S.C. §§ 1053(a) and 1054(g).

102.     By informing participants that the plan conversion had already occurred months earlier BP's actions had a "chilling effect" on plan participants who were less likely to oppose the plan change because it had already occurred. This chilling effect combined with BP's efforts to obfuscate the fact that the RAP would result in significantly decreased future benefit accruals and future benefits served BP by impeding plan participants from understanding that their pension benefits had been significantly reduced. These acts also served BP by delaying participant efforts to enforce their rights under ERISA to compel BP to keep its promises about the RAP benefits.

## COUNT 2

### BP FAILED TO PROVIDE PROPER NOTICE OF REDUCTIONS IN THE RATE OF FUTURE BENEFIT ACCRUALS UNDER ERISA § 204(h)

103.     Plaintiffs repeat and reallege the allegations in paragraphs 1 through 102 and assert this claim for equitable relief under ERISA §502(a)(3).

104.     Contrary to BP's representation that the RAP would provide benefits as good as, or better than, the BP America Retirement Plan, the RAP resulted in significant reductions in benefit accruals for former Sohio employees, including Plaintiffs.

105.     BP's 1989 RAP conversion shifted risks associated with market volatility to the participant, contrary to BP's representations. The RAP as currently administered and operated

COMPLAINT - 32

by BP is providing significantly reduced benefit accruals to class members compared with what the BP America Retirement Plan would have provided through its final average pay formula.

106.    Provision of a proper § 204(h) notice was within BP's control.

107.    BP did not provide a § 204(h) notice at least 15 days prior to the effective date of the plan amendment, and did not provide notice that the plan amendments provided for a significant reduction in the rate of future benefit accrual, as required by Public Law 99-272, sec. 11006(a), 100 Stat. 243-244.

108.    In fact, BP provided no 204(h) notice at the time of conversion from the Sohio Pension Plan to the BP America Retirement Plan (ARP) or at the time of the conversion from the ARP to the BP Retirement Accumulation Plan (RAP).

109.    BP knowingly and intentionally failed to provide a proper § 204(h) notice as part of its campaign to convince participants that the RAP conversion that had already occurred months earlier did not provide for a significant reduction in the rate of future benefit accruals.

110.    BP did not provide participants with a § 204(h) notice even after the risk foretold by Kwasha Lipton in 1988 that the RAP would reduce some pension benefits had become a reality. BP continues to assure plan participants that the RAP benefits are as good as benefits they would have received under the ARP.   BP has never sent a § 204(h) notice regarding the RAP conversion to inform participants their benefit accruals would be reduced.

111.    BP's disclosures subsequent to the plan conversion were not "sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan," in violation of § 102 of ERISA, 29 U.S.C. § 1022.  On the contrary, they were designed to obfuscate and divert participants and beneficiaries from exercising their rights and obligations under the plan.

112.    BP's purposeful failure to disclose the disadvantages of the RAP conversion, as well as its affirmative statements that the rate of future benefit accruals would not be reduced, violates its fiduciary duty under ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), to provide participants with

COMPLAINT - 33

the information needed to make well-informed employment, savings, and retirement decisions. BP's misrepresentations and nondisclosures also violate the duties of candor and truthfulness that apply to non-fiduciaries.

113.    Under ERISA § 204(h) as set out in Public Law 99-272, sec. 11006(a), 100 Stat. 243-244, BP may not enforce, as to class members, its conversion of the BP ARP (successor to the Sohio defined benefit plan) to the BP RAP.  Absent a § 204(h) notice, the plan amendments that would reduce benefits from those available to former Sohio employees under the ARP are invalid in their entirety.  The Court should declare that the 1989 conversion to the RAP may not be imposed on Plaintiffs or other former Sohio employees to reduce the benefits they would have received under the ARP formula.

114.    The Court should enter an order that directs the BP Plan Administrator to calculate the class members' retirement benefits according to the ARP's final average pay formula, with BP funding the plan as necessary to provide the retirement benefits.

## COUNT 3

### BP'S SUMMARY PLAN DESCRIPTION FAILED TO DISCLOSE BENEFIT REDUCTIONS

115.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 114 and assert this claim for equitable relief under ERISA §502(a)(3).

116.    ERISA requires that Summary Plan Descriptions (SPDs) must be distributed to participants and must disclose the circumstances that may cause reductions, disqualification, denial, loss, or forfeiture of any benefits that a participant might otherwise reasonably expect to receive on the basis of the description of the benefits offered by the plan.  29 C.F.R. 2520.102-3(i). The disclosure must be written in a manner calculated to be understood by the average plan participant. 29 C.F.R. 2520.102-2(a).  Reductions, restrictions and other disadvantages must be described no less prominently or understandably than the advantages of the plan.  29 C.F.R. 2520.102-2(b).

COMPLAINT - 34

117.    Since before 1989 when BP notified Plan Participants that it had converted the BP ARP to the RAP, these same regulations provided that the format of, "the summary plan description must not have the effect of misleading, misinforming, or failing to inform participants and beneficiaries.  Any description of exceptions, limitations, reductions, and other restrictions of plan benefits shall not be minimized, rendered obscure, or otherwise made to appear unimportant.  Such exceptions, limitations, reductions, or restrictions of plan benefits shall be described or summarized in a manner not less prominent than the style, captions, printing type, and prominence used to describe or summarize plan benefits.  The advantages and disadvantages of the plan shall be presented without either exaggerating the benefits or minimizing the limitations." *Id.*, 42 Fed. Reg. 37180.

118.    When a plan administrator, or an employer, communicates with plan participants about plan changes and benefits, they act as fiduciaries regarding those communications.

119.    The SPDs and correspondence that BP distributed to participants in 1989 did not describe the benefit reductions, conditions on receipt, or other disadvantages of the RAP.  The information BP provided about the new RAP exaggerated the benefits and minimized the limitations of the changes, and failed to inform participants that BP's unqualified promotional statements were subject to exceptions, limitations, reductions, and restrictions.

120.    Absent the notice and disclosures required by ERISA §§ 102 and 204(h), a plan's rule that causes benefits to be lost or forfeited may not be enforced.  BP may not impose the RAP benefits-formula to reduce participants' benefits to less than what would have been available to them under the final average pay formula used by the BP ARP.  Plaintiffs are entitled to a judgment ordering the plan administrator to calculate their retirement benefits under the RAP so that the benefits are no less than those calculated under the BP America Retirement Plan's final average pay formula, with BP funding the plan as necessary to provide the benefits.

COMPLAINT - 35

MERRICK, HOFSTEDT & LINDSEY, P.S.
ATTORNEYS AT LAW
3101 WESTERN AVENUE, SUITE 200
SEATTLE, WASHINGTON  98121
(206) 682-0610

**COUNT 4:**

**THE PLAN SHOULD BE REFORMED OR BP SHOULD PAY A SURCHARGE TO REMEDY BP's FIDUCIARY BREACH UNDER ERISA § 502(a)(3)**

121. Plaintiffs repeat and reallege the allegations in paragraphs 1 through 120 and assert this claim for equitable relief under § 502(a)(3).

122. Plaintiffs have suffered "actual harm," in the loss of rights protected by ERISA and in diminished pension benefits.

123. Plaintiffs suffered a "related loss" because of BP's fiduciary breach set forth above in the loss of a right protected by ERISA and in diminished pension benefits.

124. BP failed to inform the plan participants of all material facts, and its omissions were a violation of good faith, were unconscionable, and were inequitable.

125. BP and the BP Plan Administrator intentionally minimized and dismissed risks presented by the plan amendment. BP and the BP Plan Administrator withheld information that would have informed participants that the change to the cash balance plan could significantly reduce the rate of future pension benefit accruals. Information BP provided was inaccurate and misleading. BP did not disclose that the enhancement of retirement benefits for some employees by making benefits portable came at the cost of reduced retirement benefits for other employees, particularly career employees. BP and the BP Plan Administrator did not disclose that employees who remained with BP for their entire careers faced significant risk that their retirement benefits under the cash balance formula would not accrue to a level equal to benefits that would have accrued under the final average pay formula.

126. BP misled Sohio plan participants about the reason for the change in formulas. BP told participants that the amendment was "not a cost cutting measure." BP and the Plan Administrator did not disclose that the plan amendments made future benefit accruals dependent on unpredictable interest rates and salary growth, while putting limits on the range of the interest rate credit BP would have to credit to participants. The cash balance formula allowed BP to

COMPLAINT - 36

MERRICK, HOFSTEDT & LINDSEY, P.S.
ATTORNEYS AT LAW
3101 WESTERN AVENUE, SUITE 200
SEATTLE, WASHINGTON 98121
(206) 682-0610

capture more of the potential upside earning potential from market interest rate volatility without funding the cost of a corresponding increase in the accrued benefit, compared with the prior formula.  BP also limited its liability for benefits under the plan in the event market interest rates decreased, compared to the prior benefit formula.  BP represented it would bear the risk of market volatility, rather than the truth:  the risk of market volatility had been shifted to the plan participants and beneficiaries

127.    When BP made its representations concerning the plan conversion, it intended that the plan participants would rely on the representations.

128.    The plan participants, including plaintiff, reasonably relied upon the representations.

129.    BP's misrepresentations caused plan participants to be mistaken about the terms of their pension plan.

130.    BP was unjustly enriched because of its misrepresentations.  BP would not have obtained the enrichment absent the misleading communications and fiduciary breaches.

131.    BP and the BP Plan Administrator violated ERISA §§ 404(a) and 102 by issuing false, misleading, and incomplete plan descriptions and information promoting the 1989 RAP cash balance conversion. The information BP and the BP Plan Administrator distributed to plan participants in 1989 did not describe the benefit reductions, conditions on receipt, or other disadvantages of the new cash balance pension accruals.  The information BP and the BP Plan Administrator provided about the plan changes exaggerated the benefits and minimized the limitations of the changes, and failed to inform participants that the unqualified promotional statements were subject to exceptions, limitations, reductions, and other restrictions.  As a result of these ERISA violations, BP employees reasonably but mistakenly believed that growth in their cash balance benefit would equal or exceed growth that would have been provided under the Retirement Plan's final average pay formula; they believed what BP had told them.  BP obtained an undue advantage vis-à-vis its workforce by making these false, misleading, and incomplete statements in the Plan descriptions and promotional correspondence.  To remedy the

COMPLAINT - 37

MERRICK, HOFSTEDT & LINDSEY, P.S.
ATTORNEYS AT LAW
3101 WESTERN AVENUE, SUITE 200
SEATTLE, WASHINGTON  98121
(206) 682-0610

resulting inequitable harm, the RAP should be reformed to meet Class members' reasonable expectations of benefits resulting from the misrepresentations made by BP and the BP Plan Administrator.  BP's and the BP Plan Administrator's deceptive conduct set forth above warrants reformation of the cash balance pension plan document under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), or other equitable relief such as a surcharge, in order to grant Class members the pension benefits BP promised in June 1989 and thereafter.

## COUNT 5:

### THE COURT SHOULD DETERMINE THAT THE RAP AND BP MUST PRODUCE THE RECORDS REQUESTED INCLUDING RECORDS MADE AVAILABLE TO THE OMBUDSMAN

132.   Plaintiffs repeat and reallege the allegations in paragraphs 1 through 131 and assert this claim for legal and equitable relief under ERISA §502(a)(1)(A).

133.   ERISA § 502(c)(1), 29 U.S.C. § 1132(c)(1) and 29 C.F.R. § 2560.503-1 (h)(2)(iii), provide that a claimant shall be provided, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits.

134.   ERISA § 502(c)(1), 29 U.S.C. § 1132(c)(1), provides that whenever a plan administrator fails or refuses to comply with a request for any information which such administrator is required by the subchapter to furnish to a participant or beneficiary, the court may, in addition to awarding the participant a statutory penalty, order such other relief as it deems proper.

135.   Pursuant to ERISA §502(a)(1)(A) & § 502(c)(1), the Court should order that the RAP and BP provide Plaintiffs complete information within its control about the conversion of the ARP to the RAP, including: (a) BP's evaluation of what information the Plan Administrator should or should not disclose to Plan Participants about the conversion of the Sohio Plan and the ARP to the RAP since 1987; (b) BP's direction to the Plan Administrator, and the Plan Administrator's evaluations, regarding the timing and content of notices to participants about the conversion to the RAP since 1987; (c) data provided to BP during the Ombudsman review

MERRICK, HOFSTEDT & LINDSEY, P.S.
ATTORNEYS AT LAW
3101 WESTERN AVENUE, SUITE 200
SEATTLE, WASHINGTON  98121
(206) 682-0610

process; (d) the substantial data submitted to the Ombudsman by BP, including submissions by its Legal Department; its Labor, Employment & Employee Benefits Group; its Pension Administrator; and its other benefits program employees; and (e) other historical data that was collected and reviewed during the Ombudsman's analysis, including statements by BP after 1987 regarding the conversion from the ARP to the RAP.

136.    The Court should provide appropriate remedies under ERISA § 502(a)(1)(A) for BP's refusal to provide information requested by Guenther during the administrative claim process, including determination of an appropriate remedy for the false and misleading statement in the letter dated June 3, 2015 from BP's Labor, Employment & Benefits Group (Exhibit C) and BP's spoliation of evidence in withholding the August 26, 1988 letter (Exhibit D) and related documents responsive to Guenther's request.

<strong>PRAYER FOR RELIEF</strong>

WHEREFORE, Plaintiffs pray that the Court:

A.    Certify the Retroactive Opening Account Class, the Notice Class, and the Excessive Interest Rate Class.

B.    Determine, pursuant to ERISA § 502(a)(1)(A), 29 U.S.C. § 1132(a)(1)(A), that the RAP and BP must provide Plaintiffs the records information about the conversion of the ARP to RAP, including, but not limited to: (a) BP's evaluation of what information the Plan Administrator should or should not disclose to Plan Participants about the conversion of the Sohio Plan and the ARP to the RAP; (b) BP's direction to the Plan Administrator, and the Plan Administrator's evaluations, regarding the timing and content of notices to participants about the conversion to the RAP; (c) data provided to BP during the Ombudsman review process; (d) the substantial data submitted by BP's Legal Department and Benefits programs to the Ombudsman; and (e) other historical data that was collected, reviewed, or otherwise made available during the Ombudsman's analysis, including statements by BP regarding the conversion from the ARP to the RAP.  The Court should also consider granting additional equitable relief to Plaintiffs based

MERRICK, HOFSTEDT & LINDSEY, P.S.
ATTORNEYS AT LAW
3101 WESTERN AVENUE, SUITE 200
SEATTLE, WASHINGTON 98121
(206) 682-0610

upon BP's withholding of and/or spoliation of evidence during the administrative claim process, including BP's withholding of the August 26, 1988 letter from Karen Salinaro and related false statements by BP's Labor, Employment & Employee Benefit Group; and withholding actuarial studies and other documents responsive to Guenther's requests.

C.     Declare, pursuant to ERISA § 502(a)(3), that BP's retroactive establishment of Opening Accounts violates ERISA §§ 203(a) and 204(g); 29 U.S.C. § 1053(a) and 1054(g).

D.     Declare, pursuant to § 502(c)(3), that the change in the BP America Retirement Plan benefit formula to a cash balance formula violated notice requirements under ERISA § 204(h) as set out in Public Law 99-272, sec. 11006(a), 100 Stat. 243-244, as well as the requirements set out in ERISA § 204(h) as later amended, as well as the disclosure requirements of ERISA § 102 and 29 C.F.R. 2520.102-2, and therefore BP's attempt at conversion to the RAP was ineffective and voidable as to those Class member participants who would receive benefits under the RAP that are not "as good as or better than" benefits provided under the traditional final average pay formula used by the BP America Retirement Plan.

E.     Order Reformation of the Plan and that the BP Plan Administrator determine accrued benefits for the Notice Class by calculating their accrued benefits according to the BP America Retirement Plan's final average pay formula as an equitable remedy under ERISA § 502(a)(3) for the violations of ERISA §§ 102; 203(a); 204(g); and 204(h).

F.     As an equitable remedy for BP's deceptive conduct set forth above, order reformation of the RAP plan document under ERISA § 502(a)(3) to provide Class members benefits at least as great as those calculated under the BP America Retirement Plan's final average pay formula.

G.     As a remedy under ERISA § 502(a)(3) for BP's deceptive conduct set forth above, grant equitable relief such as a surcharge by having BP fund additional account credits sufficient to provide Class members pension benefits at least equal to those available under the BP America Retirement Plan, as BP promised plan participants when informing them the ARP had been converted to the RAP.

COMPLAINT - 40

1   H.      As a surcharge remedy under ERISA § 502(a)(3), order defendants to pay to any Class

2   members who have begun to receive pension benefits the difference between what they have

3   been paid and what they should have been paid under the BP America Retirement Plan as a cure

4   for the ERISA violations.

5   I.      Award the Plaintiffs costs, expenses, and reasonable attorneys' fees.

6   J.      Award the Plaintiffs such other relief as the Court deems just and equitable.

7           DATED this 13th day of April, 2016.

8

9                                           MERRICK, HOFSTEDT & LINDSEY, P.S.

10

11                                          By  /s/ *Peter Steilberg, III*
                                                Peter Steilberg, III
12                                              Washington State Bar No. 22190
                                                S.D. Texas Bar No. 2639089

13                                          Attorney for Plaintiffs and Attorney-in-Charge

14

15                                          Merrick, Hofstedt & Lindsey, P.S.
                                            3101 Western Avenue, Suite 200
16                                          Seattle, WA  98121-3017
                                            (206) 682-0610 - Telephone
17                                          (206) 467-2689 - Facsimile
                                            psteilberg@mhlseattle.com

18                                          MERRICK, HOFSTEDT & LINDSEY, P.S.

19

20                                          By  /s/ *Philip R. Meade*
                                                Philip R. Meade
21                                              Washington State Bar No. 14671
                                                S.D. Texas Bar No. 2639087

22                                          Of Counsel Associated Attorney

23                                          Merrick, Hofstedt & Lindsey, P.S.
                                            3101 Western Avenue, Suite 200
24                                          Seattle, WA  98121-3017
                                            (206) 682-0610
25                                          pmeade@mhlseattle.com

26

COMPLAINT - 41

JAMES, VERNON & WEEKS, P.A.


By /s/ *Leander L. James*
    Leander L. James
    Idaho Bar No. 4800
    S.D. Texas Bar No. 2611757

Of Counsel Associated Attorney

James, Vernon & Weeks, P.A.
1626 Lincoln Way
Coeur D'Alene, ID  83814
(208) 667-0683
**ljames@jvwlaw.net**


JAMES, VERNON & WEEKS, P.A.


By /s/ *Susan Weeks*
    Susan Weeks
    Idaho Bar No. 4255
    S.D. Texas Bar No. 2636824

Of Counsel Associated Attorney

James, Vernon & Weeks, P.A.
1626 Lincoln Way
Coeur D'Alene, ID  83814
(208) 667-0683
**sweeks@jvwlaw.net**

MERRICK, HOFSTEDT & LINDSEY, P.S.
ATTORNEYS AT LAW
3101 WESTERN AVENUE, SUITE 200
SEATTLE, WASHINGTON  98121
(206) 682-0610