United States District Court
Southern District of Texas
**ENTERED**
March 28, 2024
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| FREDRIC A. GUENTHER, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| VS. | § | CIVIL ACTION NO. 4:16-CV-995 |
| | § | |
| BP RETIREMENT ACCUMULATION | § | |
| PLAN, *et al.*, | § | |
| | § | |
| Defendants. | § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This case, "yet another in a long list of cases challenging an employer's conversion to a cash balance retirement plan under the Employee Retirement Income Security Act ("ERISA")[,]"[1] was tried to the bench for 14 days. The primary issue is the sufficiency of the explanation of the conversion of a defined benefit pension plan from a final average pay formula to a cash balance formula. The Court finds that the plaintiffs are entitled to equitable relief under Section 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3). The parties are **ORDERED** to file supplemental briefs regarding the appropriate form of that equitable relief on the schedule set forth below.

The following are the Court's findings of fact and conclusions of law. *See* FED. R. CIV. P. 52. Any conclusion of law more properly characterized as a finding of fact is adopted as such, and any finding of fact more properly characterized as a conclusion of law is adopted as such.

---

[1] *Amara v. CIGNA Corp.*, 534 F. Supp. 2d 288, 295, 343 & n.1 (D. Conn. 2008) (*Amara I*) (collecting cases) ("Despite their popularity among employers, cash balance plans have spawned considerable litigation . . . and in some cases, complaints by employees resulted in partial or complete rollbacks of the proposed changes.").

A.  **FINDINGS OF FACT**

1.      BP America Inc. is a Delaware corporation that was incorporated on July 19, 1974.

2.      On June 23, 1987, all the outstanding shares of common stock of Standard Oil of Ohio ("Sohio") were transferred to BP America.

3.      Effective January 1, 1988, BP merged a number of other pension plans into the Sohio Retirement Plan, and restated and amended the plan to be called the BP America Retirement Plan. The plan merger was effectuated through the adoption and restatement of an amended plan document. The plan's name, which originally became effective 10/01/1932, was changed from The Retirement Trust for Employees of the Standard Oil Company and Subsidiaries Plan 001 to BP America Retirement Plan ("ARP").

4.      Under the ARP, participating employees did not bear the risk of fluctuations in interest rates or the market. A participant's retirement benefit under the ARP was determined by multiplying a participant's years of service by a specified factor. The resulting product was then multiplied by the participant's final average earnings, with a specified portion of the participant's expected Social Security benefit subtracted from the product computed.

5.      Under the ARP, BP had to buy a retiring employee an annuity that paid a specified sum irrespective of whether falling interest rates made it more expensive for BP to pay for that annuity. And falling interest rates also meant that any sum BP set aside to buy that annuity would grow more slowly over time, thereby requiring BP to set aside more money to make any specific sum available at retirement.

6.     The ARP plan also contained an early retirement benefit commencing at the age of 55 which was a significant benefit to older employees.

7.     BP America Inc., a Delaware corporation, was the Plan Sponsor.

8.     The ARP plan named BP America, Inc.'s Vice President - Human Resources as the Plan Administrator.

9.     BP consolidated fourteen (14) other pension plans into the ARP effective January 1, 1988.

10.    The Vice President of Human Resources did not execute the Restated and          Amended plan until December 20, 1988. S.R. Robertson was the Plan Administrator at this time.

11.    Effective January 1, 1989, BP amended the ARP and renamed it the BP Retirement Accumulation Plan ("RAP"). BP replaced the final average pay formula in the ARP with a "cash balance" benefit formula.

12.    Defendant BP Corporation North America Inc. ("BPCNA") is a subsidiary of BP America Inc. and is the current plan sponsor of the BP Retirement Accumulation Plan ("RAP").

13.    Leslie "Les" Owen began working for Sohio in 1970.

14.    Owen was employed by Sohio and was a participant in the Sohio Retirement Plan at the time BP completed its acquisition of Sohio in 1987.

15.    Owen retired from employment with BP in 2011 and elected to receive a lump sum distribution of his pension benefit.

16.    Fredric "Fritz" Guenther began working for Sohio in 1979.

17.      Guenther was employed by Sohio and was a participant in the Sohio Retirement Plan at the time BP completed its acquisition of Sohio in 1987.

18.      Guenther retired from employment with BP in May 2018 and elected to receive a lump sum distribution of his pension benefit.

19.      Walton Fujimoto began working for Sohio in 1977.

20.      Fujimoto was employed by Sohio and was a participant in the Sohio Retirement Plan.

21.      Fujimoto retired from employment with BP in April 2014 and elected to receive a lump sum distribution of his pension benefit.

22.      After retiring from BP, on December 31, 2014, Fujimoto was offered and signed a settlement agreement.

23.      BP Exploration Inc. offered its employees who retired between April 15, 2014, and September 15, 2014, including Plaintiff Walt Fujimoto, a one-time $75,000-per-employee payment in order to accomplish reductions in staffing that would be necessitated by a divestiture. BP required the employee to sign a non-negotiable Confidential Settlement and Release of Claims (Settlement Agreement) to receive this payment.

24.      On December 15, 2014, at 2:57 p.m. Alaska Time, Senior BP Counsel Helena Hall, referencing the $75,000 payment and Settlement Agreement, informed Fujimoto through his counsel, "In sum, this offered payment is not related to any claims the Fujimotos may feel they have related to their pension benefits."

25.      In the Fall of 1987, Kwasha Lipton, a consulting firm, presented a management briefing to BP America, Inc., for converting to a cash balance pension

formula. One of the listed reasons for converting was to reduce costs. One of the financial objectives supporting conversion was control of inflation-related benefit costs and liabilities.

26.     The Fall 1987 Kwasha Lipton management presentation materials illustrated that, in comparing the current pension plan to a cash balance plan that at age 65, a participant would receive less under the RAP because the cash balance plan repositioned costs and benefits.

27.     The record contains an agenda for a November 6, 1987 pension plan design meeting.

28.     Following the November 6, 1987 meeting, a summary of the discussion and conclusions reached during the meeting was prepared for BP by Kwasha Lipton. These notes reveal employee reaction to the conversion was a factor considered by management. The meeting minutes reflect that management understood the final average pay formula was the "richest formula for all employees."

29.     On March 28, 1988, Kwasha Lipton prepared a memorandum to Paul McAuliffe, Liz Rossman and Ellen Collier entitled "Uniform Salaried Pension Plan Study" wherein the general goals of a pension plan payment were discussed, particularly "our goal of a uniform plan for all salaried employees of BP America without incurring a substantial cost increase."

30.     Paul McAuliffe joined Sohio from the Department of Labor as their labor relations and employee benefits attorney, then switched to the human resources department until he left BP at the end of 1990. Elizabeth Rossman was the manager of the pension program in Mr. McAuliffe's group. Ellen Collier joined BP as the conversion

commenced as the Senior Benefits Analysis at BP America, Inc.

31.     On April 12, 1988, Kwasha Lipton prepared another memorandum for Paul McAuliffe, Liz Rossman and Ellen Collier entitled "Uniform Salaried Pension Plan Study" that provided benefit comparisons under the then-current pension program and a cash plan and a brief discussion of the relative costs of the two types of plans.

32.     On April 19, 1988, Kwasha Lipton faxed Ellen Collier a graphic comparison of the two plans showing that at age 55 through approximately age 62, a full-career employee would receive more retirement benefits under the existing plan:

Confidential

BP_0027915



# BP AMERICA INC.

## Lump Sum Values of Benefit Accruals for Full Career Employee
## Current Retirement Program vs. Cash Retirement Program

Lump Sum Values of Benefits
(thousands of dollars)

Age at Termination or Retirement

Standard Oil Pension Plan

Cash Pension Plan

33.     On April 20, 1988, McAuliffe sent a memorandum to the BP Chief Executive Officer's Committee, which consisted of the Chief Financial Officer, Lord Edmund John Phillip Browne; the Chief Executive Officer of BP North America, James Ross; and the head of human resources, Syd Robertson. In the memorandum, McAuliffe highlighted that, since converting to a cash balance formula would be "a radical change from past pension practice, thorough and skillful employee communication would be essential to avoid confusion and suspicion."

34.     In June 1988, materials were prepared by Kwasha Lipton for a BP management briefing on the proposed cash balance plan design. These briefing materials provided comparison charts of the two plan formulas that revealed that an employee retiring at the average age of 60 would receive less pension benefits under the cash balance plan formula than the employee would receive under the current pension plan formula. Also included was a comparison of the current and cash balance plans based upon the lump sum value of the benefit "earned," indicating that at approximately age 46, the current pension plan began outperforming the proposed cash balance plan:



35.     On July 13, 1988, Paul McAuliffe prepared a memorandum to the Chief Executive Officer's Committee.  This memorandum sought approval to amend the plan formula to the cash balance formula. The memorandum stated the plan conversion provided BP with flexibility in managing costs because "'final pay' plans" like the ARP "build in an inflexible multiplier that can lead to significant 'built-in' increases in pension cost, particularly as a work force ages." McAuliffe's memorandum suggested that company-supported saving plans that allowed retirement accumulation outside the pension plan were the vehicle BP should use for employee retirement inflation protection rather than the final average pay plan. It also acknowledged that the cash balance formula was "emerging[,]" was "not yet majority practice," and "depart[ed] from the 'final pay' tradition which [wa]s still predominant practice with the BP Group."

36.     On July 22, 1988, Kwasha Lipton prepared a management briefing that

discussed the plan design.

37.     On August 10, 1988, Kwasha Lipton prepared a comparison of the new plan as a percentage of the old plan at various ages, service levels, and interest rates.

38.     On August 15, 1988, Mr. McAuliffe prepared a memorandum to Lord Browne on the plan amendment noting that the current plan's legal structure "entail[ed] a significant degree of prefunding of the ultimate pension obligation" and tied up money "within the pension trust that might be better used in other Company operations." The enclosed attachment projected that a plan conversion would reduce BP's pre-funding obligation by $5 million in 1989 and $11 million for each of the fiscal years 1990-1993.

39.     On August 19, 1988, Kwasha Lipton provided BP with details of the proposed account balance plan formula.

40.     Kwasha Lipton prepared a memorandum to Elizabeth Rossman on August 26, 1988, with materials for Ms. Rossman to present to Lord Browne regarding the proposed conversion. The letter recognized a "problem group" of employees between ages 40-49 who would not receive a comparable retirement benefit under the proposed plan amendment when that "problem employee" retired. The design solution recommended to Lord Browne was a "tradeoff" between the current plan benefits and the amended plan benefits wherein the problem employee would receive less than 100% of the current plan age 60 retirement to avoid giving the problem employee greater than 100% of the current plan benefit at an age 65 retirement.

41.     Tables enclosed with the Kwasha Lipton August 26, 1988 letter indicated that 29.5% of the employees were in the "problem group" and most would receive benefits

under the amended plan formula that were less than the benefits under the current plan formula between the retirement ages of 55 to 60, with or without service caps. Kwasha Lipton further refined the analysis to each problem employee's specific age at the time of transition.

42. One of the tables enclosed with the August 26, 1988 letter also demonstrated that, when a service cap was retained, some of the age 30-39 employee group—an age group that represented 41.6% of the workforce—also received benefits under the amended plan formula that were less than the benefits under the current plan formula at retirement age 55 and all of them received less at retirement age 60. Another of the tables enclosed with the August 26, 1988 letter expressly identified the anticipated shortfalls for employees aged 35 through 49 with different years of service:

Kwasha Lipton

BP AMERICA INC.

Illustration of Benefits Due upon Retirement at Age 60
Proposed Account Balance Plan vs. Current Plan
35 Year Service Cap Retained

| Age/Service at Change | Current Plan | | Account Plan | | Shortfall | |
|---|---|---|---|---|---|---|
| | Annuity | as % Final Pay | Annuity | as % Final Pay | Annuity | as % Final Pay |
| 35 / 5 | $58,000 | 34 | $52,200 | 31 | $ 5,800 | 3 |
| 35 / 10 | $42,200 | 36 | $39,700 | 34 | $ 2,500 | 2 |
| 40 / 1 | $32,400 | 24 | $30,500 | 23 | $ 1,900 | 1 |
| 40 / 5 | $36,300 | 27 | $34,500 | 26 | $ 1,800 | 1 |
| 40 / 10 | $47,300 | 34 | $43,000 | 31 | $ 4,300 | 3 |
| 40 / 15 | $71,900 | 41 | $65,400 | 37 | $ 6,500 | 4 |
| 45 / 1 | $14,600 | 15 | $13,400 | 14 | $ 1,200 | 1 |
| 45 / 5 | $26,000 | 22 | $24,700 | 21 | $ 1,300 | 1 |
| 45 / 10 | $29,400 | 27 | $27,600 | 25 | $ 1,800 | 2 |
| 45 / 15 | $35,800 | 34 | $32,600 | 31 | $ 3,200 | 3 |
| 49 / 1 | $ 5,400 | 12 | $ 5,300 | 13 | $    100 | 0 |
| 49 / 5 | $10,500 | 13 | $10,500 | 13 | $ N/A | |
| 49 / 10 | $24,900 | 24 | $23,900 | 23 | $ 1,000 | 1 |
| 49 / 15 | $29,900 | 27 | $29,000 | 26 | $    900 | 1 |
| 49 / 20 | $38,800 | 35 | $36,900 | 33 | $ 1,900 | 2 |

August 26, 1988

43.     On August 26, 1988, Kwasha Lipton also prepared a revised account plan formula "[t]o address the tendency of the plan to over provide for employees with very long service[.]"

44.     On September 1, 1988, Kwasha Lipton faxed BP lump sum benefits comparisons at termination or retirement at several ages between 35 and 65 for two example employees, one an employee hired at age 30 with a starting salary of $40,000.00 and the other an employee hired at age 40 with a starting salary of $40,000.00. For both employees, the value was significantly higher at retirement ages 60 and 62 under the ARP than under the proposed RAP. For the employee hired at age 40, the value of the retirement benefit was significantly higher at retirement age 65 under the ARP than under the proposed RAP.

45.     On September 2, 1988, Kwasha Lipton illustrated benefits due at retirement with a 35-year service cap for B.E Davies, age 47; W.J. Johnson, age 47; and W.A Sears, age 54. Kwasha Lipton's comparison showed that, for retirement ages 55-61, all three workers received fewer pension benefits under the cash-balance RAP formula than the ARP formula.

46.     On September 21, 1988, Mr. McAuliffe wrote a memorandum to the Chief Executive Officer's Committee to address two concerns it had expressed. In explaining how the new plan worked, Mr. McAuliffe indicated that the employee's pension balance would grow based on "interest credits" which "would vary annually,

14

based upon market interest rate indicators." Mr. McAuliffe also reported that the financial impact of the new plan was positive for BP because liability growth associated with the new plan "would be more controllable in the future as it would be less sensitive to inflation" than liability growth under the ARP. One of the reasons Mr. McAuliffe advanced for adopting the plan was that it assisted BP in managing its costs related to the plan because it removed the risk to the Company associated with increases in inflation and eliminated the "inflexible multiplier" found in "'final pay' plans" like the ARP. In his deposition under Federal Rule of Civil Procedure 30(b)(6), Clifford York, BP's Head of Pensions and Benefits for the Americas, acknowledged that "you could infer that" BP shifted the inflation risk from itself to its employees.

47.     A chart dated October 1, 1988, showed one objective of the plan design was to eliminate early retirement subsidies and avoid major expense increases. Moreover, an "Adoption of Account Balance Pension Plan" management briefing paper dated November 16, 1988, was prepared wherein the plan conversion was discussed, and charts with features, financial impact, and restructuring comments were included. The briefing indicated the principal objective in restructuring the plan design was to improve employee understanding and appreciation of pension benefits, which was to be achieved by communicating pension growth throughout an employee's career as an increasing lump sum account balance; and by accelerating the build-up of pension value during the earlier career stages and younger ages. This paper acknowledged, "More rapid build-up of pension accruals in early career generates a more adequate and portable benefit for the employee who terminates before age 55. This is offset by scaling back the generous early

retirement subsidies currently provided to employees retiring between ages 55 and 60." This paper acknowledged that the cash balance was not yet a majority practice in the U.S. and was an emerging pension plan design concept. The memorandum informed BP management that there were benefits to BP for amending the plan, including a slightly lower total pension liability. It also informed management that the conversion resulted in more controlled pension liability in future years that was less sensitive to inflation and improved funding flexibility. An accompanying exhibit indicated the plan amendment was designed to "control costs[.]" This briefing also informed management that interest credit accruals would vary annually according to changes in the one-year T-bill market.

48.     On November 17, 1988, Mr. McAuliffe prepared a memorandum to A. S. Herbert, head of Group Pensions at BP plc in London, forwarding information provided to the BP America CEO's Committee concerning the proposed plan amendment. An accompanying note indicated Mr. McAuliffe directed a staff member to assemble an extra set of the same materials and send them to Syd Robertson, the Plan Administrator.

49.     On November 18, 1988, a draft Kwasha Lipton memorandum summarized the plan design and indicated that an employee communication campaign would be detailed in a separate memo. On December 13, 1988, the major features of the RAP were set out in a memorandum stating that the plan would become effective January 1, 1989.

50.     In the "Adoption of Account Balance Pension Plan" management briefing paper, BP acknowledged employee retention was one of its goals in communicating the conversion to employees.

51.     Before the formula was amended, the prior plan formula provided participants with an early retirement benefit at age 55 and an unreduced retirement benefit beginning at age 60. BP knew at adoption that the new cash balance plan formula would accrue lower retirement benefits at age 55 than the existing average pay formula.

52.     Kwasha Lipton authored a letter dated November 17, 1988, directed to Elizabeth Rossman, Manager of Pension Plans, acknowledging a meeting with Ms. Rossman and others at Kwasha Lipton the previous week. This letter summarizes BP's objective in communicating and introducing the cash balance plan amendment. The stated objectives included "market[ing] the features of the new plan" and "ensur[ing] a smooth transition to the new plan" while "recognizing the existing climate within the employee population[.]"

53.     To that end, on November 17, 1988, Kwasha Lipton outlined a communication campaign for BP. Included in the communication campaign was the recommendation for a letter from senior management introducing and endorsing the amended plan "accompanied by a letter from the business head custom-tailored to suit a particular segment of the organization[;] a highlights brochure providing a brief overview of the plan; and employee meetings led by knowledgeable benefits experts.

54.     On November 18, 1988, a memorandum from O. T. Williams, BP's corporate attorney, was circulated to Ellen Collier and others, which included attachments from Kwasha Lipton. These attachments outlined objectives for the new plan, including that part of the plan's purpose was to increase employee appreciation for pensions; ensure

BP maintained a "competitive position;" and "enhance the company's flexibility in managing costs." The materials from Kwasha Lipton included a long list of "Suggested Communication Elements[.]"

55.     On November 28, 1988, Kwasha Lipton prepared a letter to Liz Rossman with a draft letter for senior management to use introducing the new account balance plan. The letter pointed out that the proposed senior management letter might have a statement that "[wa]s not entirely correct" for "a small group of employees[.]" The statement in the proposed letter that was of concern stated, "[The RAP] is designed to provide a fair transition to assure that benefits under [the RAP] will at least equal – if not exceed – what you would have earned under your prior plan."

56.     Consistent with the promotional campaign, BP prepared a uniform set of materials to be used throughout the organization for use by the human resources organization that included scripts and a slide deck so that human resources could deliver information at the planned employee meetings. BP had training sessions with human resource personnel within the organization called "train the trainer" seminars. The human resource groups were trained to give presentations at the employee meetings, and the presentation materials were designed to ensure uniform, consistent messaging throughout BP.

57.     On December 5, 1988, Kwasha Lipton provided a second draft of a senior management letter for BP's suggestions and a first draft of a short highlights brochure. The short brochure indicated that supplemental interest credits "are designed to ensure that your retirement benefit under the new Plan will be comparable to the benefit you would have received under your prior pension plan had it continued unchanged."

58.     On December 5, 1988, Kwasha Lipton provided BP with a first draft of a

"long version" of the highlights brochure. The long version of the highlights brochure, like the short version, indicated that supplemental interest credits "are designed to ensure that your retirement benefit under the new Plan will be comparable to the benefit you would have received under your prior pension plan had it continued unchanged."

59.     On December 8, 1988, Kwasha Lipton provided a proposed form letter for Syd Robertson, Vice President - Human Resources (the Plan Administrator at that time), to send to employees that contained language stating that "[t]he Plan [wa]s designed to provide a fair transition to assure that benefits under the new Plan will at least equal – if not exceed – what you would have earned under your prior plan."

60.     On December 9, 1988, Kwasha Lipton wrote Elizabeth Rossman and provided a third draft of the senior management letter and a second draft of the short highlights brochure.

61.     On April 11, 1989, Elizabeth Rossman utilized a form memorandum directed to several human resource employees working in various locations and for different BP subsidiaries, informing them of a significant revision to the ARP and explaining that "[a] detailed communications campaign will begin in June to announce and explain the Retirement Accumulation Plan to all participating employees." The memorandum explained that training sessions were scheduled to prepare human resources staff members to review communications materials, explain the retirement plan revisions in extensive detail, and define the human resources staff's role in ensuring a smooth transition to the revised plan.

62.     On April 21, 1989, a sixth draft of the long highlights brochure was prepared. It stated that "The plan is designed to provide a retirement benefit that is comparable to - and, in most cases, better than - the benefit you would have received under the prior pension formula." In the "Supplemental Interest Credits" section, it stated that "Supplemental interest credits are designed to provide a benefit under the Retirement Accumulation Plan that is comparable to the benefit you would have received under the prior pension formula had it continued unchanged."

63.     On April 25, 1989, Kwasha Lipton provided the thirteenth draft of the short highlights brochure. Therein, BP added a heading called "It's Secure" that said, "Your pension benefit will continue to be fully supported by contributions from the company. This means that BP America - not you - bears all the risk associated with investments in the Plan."

64.     Guidelines for human resources leaders were included in a document prepared by Kwasha Lipton entitled "Strategies for Conducting Successful Meetings." Management was given the goal to positively promote the conversion to employees so as to retain the employees. The materials informed the human resources meeting leaders that "[t]he degree of employees' acceptance of the Retirement Accumulation Plan will depend—in part—on how well it is communicated" and that "interaction at the meetings will determine how well [employees] understand the Plan and how favorably they receive it." Meeting leaders were instructed to use a set of 35mm slides and a script provided to them, including, if necessary, the script's "Question and Answer section[.]" The leader was to hand out a detailed brochure (the long highlights brochure) at the meeting that provided a more detailed description of the plan. The scripted materials suggested that human resource employees advise employees to review the long highlights brochure after the

meeting.

65.     Other management materials included slides for management to use during the presentation. One slide informed employees that the long highlights brochure was intended to be a lasting reference piece.

66.     The scripted presentation informed the participants that the opening account balance included the early retirement benefit but did not explain that it was removed from the plan or what it meant in terms of the retirement benefit paid between ages 55 and 65.

67.     The scripted presentation informed participants that the regular interest was the average one-year treasury bill plus 1% but did not explain that interest rate fluctuation was a new risk shifted to the employees.

68.     A set of slides illustrating the highlights of the RAP was also promulgated as part of this management training. These slides illustrate that BP "bears investment risks" and that the interest credits are tied to the prior year's one-year treasury bill rate plus 1% but did not explain that BP employees now bore the risk of interest rate variability.

69.     As part of the management training, BP provided anticipated questions and required answers for the human resource managers. One of the anticipated questions about work hours that counted towards accumulation benefits informed BP employees that those with a normal work schedule in excess of 40 hours would continue to get credit for the extra regular scheduled work hours. Another anticipated question on interest rates gave interest rates from 1968 through 1988, many of which were below the current treasury bill rate.

70.     A final draft of a video script relating to the RAP, dated May 2, 1989, was prepared for Christopher Bratt, manager of video communications at BP America. This script included language highlighting the ease of figuring out one's benefit under the RAP

and how difficult other pension plans were to understand.

71.     A copy of the RAP Major Features slides and a script were given to BP human resources representatives. None of the negative implications of the plan were highlighted in any of these slides.

72.     Beginning in the summer of 1989, BP announced the amended plan formula to its employees and issued several communications to them describing the new formula.

73.     On or about June 12, 1989, BP distributed a letter from James Ross, then the Chief Executive Officer of BP America, to all BP employees. The parties refer to this letter as "the Ross letter."

74.     Included with the Ross letter was a copy of the short highlights brochure entitled "Introducing the Retirement Accumulation Plan." The parties refer to the short highlights brochure included with the Ross letter as "the Short Brochure."

75.     The Ross letter was printed on BP letterhead and addressed to "Dear Colleague[.]" The Ross letter announced "a major overhaul of the BP America pension program." In the letter, Mr. Ross claimed the existing pension plan was "fully competitive" but criticized it as having significant faults, including that "[i]ts formulae were extremely complicated, and difficult to understand[,]" and touted the new plan formula as "much simplified." Mr. Ross further wrote that:

> We have preserved the principal strengths of the former plan. BP America pays the full cost. BP America is responsible for funding, and bears the full investment risk. And the plan provides a retirement benefit to career employees that is comparable to the fully competitive benefit under the prior formula.

Mr. Ross explained the conversion was "not a cost-cutting exercise" and expressed confidence that the employees would "share [his] enthusiasm" for the amended plan.

76.     Consistent with Kwasha Lipton's communication campaign, George Nelson, President, BPX (Alaska) Inc., executed a letter dated June 12, 1989, on BP Exploration (Alaska), Inc. letterhead to all staff that enclosed the James Ross memorandum indicating it was a new pension plan called the Retirement Accumulation Plan, effective January 1, 1989.

77.     Nelson's letter enclosed the Short Brochure. The Short Brochure informed participant employees that:

- Pension plans were the least understood employee benefit based on complicated formulas, "so most people do not understand how their pension works."

- "[y]our pension benefit will continue to be fully supported by contributions from the Company. This means that BP American – not you – bears all the risk associated with investments in the Plan."

- In the next few weeks, employee participants would be invited to attend a meeting to introduce the Plan and learn more about how it worked.

78.     BP subsequently distributed the long highlights brochure at employee meetings. The parties refer to the long highlights brochure as "the Long Brochure."

79.     On July 19, 1989, C.M. Laird, Manager, Personnel Support, sent another letter on BP Exploration (Alaska) Inc. letterhead to employees regarding the RAP and informing them that employee presentations on the new plan would be held the week of July 24th for Anchorage and North Slope employees. The Long Brochure was enclosed with the letter. Mr. Laird noted the purpose of the meetings was for employees to gain "a better understanding of the Plan's enhancements."

80.     The Long Brochure represented to employee participants that:

- unlike most pension plans, the RAP "is easy to understand[;]"

- "[t]he Plan is designed to provide a retirement benefit that is comparable to — and, in most cases, better than — the benefit you would have received under the prior pension formula.";

- BP America bears all the risk associated with Investments by the Plan;

- BP America pays the full cost of the Plan;

- The opening account balance included the value of the early retirement benefit under the prior benefit formula;

- Supplemental interest credits on the opening balance were being provided because the ARP formula provided lower benefits than would have been earned under the RAP had it always been in effect; and

- The Long Brochure was a summary of the plan but not a summary plan description.

81.    The average participant understood a comparable retirement benefit was one that was at least equal to what they would have received under the prior benefit formula.

82.    After the employee presentations, BP sent out opening balance letters that did not compare the ARP and the RAP.

83.    On December 26, 1989, Mr. McAuliffe wrote to D. R. Bankowski, Vice-President, Human Resources (and the Plan Administrator at that time), requesting approval of the adoption of the RAP.  Mr. Bankowski executed a concurrence to the approval of the plan adoption.

84.    The final plan was adopted on December 28, 1989, but was retroactively adopted effective January 1, 1989. Until this plan document was adopted, there was no plan

document for the participants to look at.

85.    The cash balance plan shifted the risk of a drop in interest rates and other investment risks from BP to its employees. In contrast to the prior ARP plan, under the cash-balance RAP plan, the retirement income fluctuates depending upon the Interest Crediting rate, the pattern of salary increases, current market rates, as well as other variables.  Under the cash balance plan, BP did not have to buy a retiring employee an annuity that paid a specific sum as they had to do under the ARP.  The employee would simply receive whatever sum his "account" contained. And falling market interest rates meant that the account's lump sum would earn less money each year after the employee retired. Annuities, for example, would become more expensive (any fixed purchase price paying for less annual income). At the same time falling interest rates meant that the individual account would grow more slowly over time, leaving the employee with less money at retirement.

86.    The summary plan description for the RAP was published in July 1991. It also was not available for plan participants to look at in 1989.

87.    BP never provided class members with a specific comparison of their retirement benefit under the ARP and the RAP, even when requested.

88.    Nothing BP sent out to participants in the intervening years alerted plan participants that BP's promise of a comparable retirement benefit was false for the Class.

89.    BP was acting as a fiduciary during the 1989 communications campaign.

90.    Neither BP nor the Plan Administrator complied with the 1989 requirements of ERISA § 102(a), 29 U.S.C. § 1022(a), to disclose to participants in a manner calculated to be understood by the average plan participant the plan changes, including the removal of the early retirement benefit subsidy and the circumstances by which the participant's retirement benefits might not be as good or better than under the final average plan as

promised.

91.     Neither BP nor the Plan Administrator complied with the 1989 requirements of ERISA § 104(b), 29 U.S.C. § 1024(b), notifying participants of material modifications to the plan.

92.     No ERISA § 204(h), 29 U.S.C. § 1054(h) notice of a significant reduction in benefits was provided to employees by BP or the Plan Administrator.

93.     BP's communication campaign violated BP's fiduciary duty imposed pursuant to ERISA § 404, 29 U.S.C. § 1104, to discharge his/her duties solely in the interest of participants and their beneficiaries for the exclusive purpose of providing benefits to participants in the following ways: 1) BP promoted only the positive aspects of the plan change to employees for the purpose of retaining the employees, 2) BP made promises to employees about comparative plan performance without warning employees about circumstances that would cause the promise to fail; 3) BP did not share with employees that BP realized benefits from the conversion other than immediate cost savings; 4) BP did not share with employees that the converted plan introduced risk to the employees they had not previously borne; and 5) BP did not explain it had removed the early retirement benefit, and what that meant to employees as they reached age 55.

94.     The 1989 Form 5500, Schedule B, listed 13,025 active participants in the RAP in 1989.

95.     For participants who were age 50 or older as of December 31, 1988, the RAP plan contained a provision that provided their benefit would be calculated as the greater of the benefit produced by their prior, final average pay formula, or the result of the cash balance benefit calculation.

96.     For participants under the age of 50 as of December 31, 1988, the amended

RAP provides for the calculation of benefits under the cash balance formula.

97.     The named Plaintiffs—and all members of the Class—were under the age of 50 as of December 31, 1988.

98.     142 employees were 50 years old or older on January 1, 1989, the effective date of plan conversion.

99.     There were 3,571 Sohio Heritage Employees whose benefits were converted in 1989 (though there may have been as many as 3,940), and a total of 8,221 BP RAP participants were converted to the new plan in 1989.

100.    The Class is so numerous that the joinder of all members is impracticable.

101.    The Plaintiffs met the numerosity requirement.

102.    The questions about BP's violation of ERISA's notice and disclosure requirements are common to the Class.

103.    The question of BP's breach of ERISA § 404(a) fiduciary duty is common to the Class.

104.    The Class members' claims raised common factual and legal questions that generated common questions.

105.    The Plaintiffs met the commonality requirement.

106.    The claims in this suit arise from the same course of conduct and are brought under the same legal theory.

107.    Plaintiffs met the typicality requirement.

108.    The Plaintiffs possess a sufficient level of knowledge and understanding to be capable of controlling or prosecuting this litigation.

109.    The Plaintiffs adequately represent the Class.

110.    There was an information asymmetry between BP and its employees.

111.    The employees were mistaken about their future benefits because of BP's Communication Campaign and the failure to comply with ERISA's notice and disclosure requirements.

112.    The Court finds persuasive the expert opinion of Lawrence Deutsch, an actuarial and pension-consulting expert, that BP's plan conversion caused a substantial reduction in benefits for the Class.

113.    BP's violations of ERISA entitle the Class to equitable relief under ERISA § 502(a)(3).

114.    BP Exploration Inc. offered its employees who retired between April 15, 2014, and September 15, 2014, including Plaintiff Walt Fujimoto, a one-time $75,000-per-employee payment in order to accomplish reductions in force that would be necessitated by a divestiture. BP required the employee to sign the non-negotiable Settlement Agreement to receive this payment.

115.    BP Exploration (Alaska) assured Fujimoto that the execution of the settlement agreement did not release the present ERISA claim. Helena Hall, in-house counsel for BP Exploration (Alaska) Inc., stated to Fujimoto's Counsel on December 15, 2014: "In sum, this offered payment is not related to any claims that the Fujimotos may feel they have related to their pension benefits."

116.    In reliance upon Ms. Hall's representations, Fujimoto executed the agreement and accepted payment.

117.    BP Exploration (Alaska) Inc. did not execute the agreement.

118.    Mr. Fujimoto did not release his claim in this matter.

119.    The claims of the class certified in this case are not based on the same nucleus of operative facts as the claims brought in *Nichols v. BP America Retirement*

*Accumulation Plan*, which was closed on September 27, 2002. *See* Northern District of Illinois case number 1:01-CV-6238 at docket entry 31.

120.    The operative facts of the *Nichols* class were whether BP improperly projected the cash balance lump sum owed to employees at age 65 and then improperly discounted it back to present value under the RAP, known as the "whipsaw" calculation.

121.    The *Nichols* release was limited explicitly to claims "based on or arising out of, or related to, in whole or in part, the determination of lump sum distributions by the Plan."

122.    The *Nichols* plaintiff was not in privity with the *Guenther* plaintiffs.

123.    The operative facts of the *Guenther* litigation are whether BP and the RAP violated the ERISA notice and disclosure requirements owed participants regarding changes to the plan's benefit formula imposed by ERISA §§ 102, 104, 204(h) and breached fiduciary duties owed participants under ERISA § 404 in 1989 when converting from a final average earnings formula to a cash balance formula.

124.    *Res judicata* does not preclude class members who received a lump sum payment adjustment under the RAP in the *Nichols* case from participating in the *Guenther* class. It may reduce the amount to which the class member is entitled.

125.    The *Nichols* settlement agreement did not release any portion of the *Guenther* claim.

126.    In September 1999, BP announced in its Focus on Benefits newsletter that it was transitioning its Amoco heritage employees to the RAP in the mid-2000s. In this newsletter, BP told Amoco heritage employees, "[i]n general, while cash balance plans are often more generous for employees who divide their careers among several employers an employee who works for only one company through his or her career may earn a greater

benefit under a traditional plan."

127.    Rick Dorazil, VP Total Reward, Western Hemisphere, sent an email to heritage Sohio employees dated July 21, 2011, that indicated he was responding to queries to the CEO's office about pension changes to heritage Castrol, Arco, AMOCO and Toledo Master Hourly employees. Mr. Dorazil assured employees the early retirement benefit was factored into their opening account balances in 1989. He also explained why BP used the interest rate projection in the communications. Mr. Dorazil assured Sohio employees that BP had provided heritage Sohio employees with the pension formula they were promised at conversion. He did not address whether the RAP pension formula provided Sohio employees (or others) with a pension benefit comparable to, or in most cases better than, the ARP pension formula. Mr. Dorazil concluded that BP would not be offering a similar pension enhancement to Sohio heritage employees because of his earlier explanation in the letter that Sohio employees would not experience a period of non-accrual similar to what would happen to the other heritage groups.

128.    BP has an Office of the Ombudsman ("OoO"). BP contracted with retired Judge Stanley Sporkin to be the Ombudsman and Billie Garde to serve as Deputy Ombudsman.

129.    The Ombudsman was initially contacted by telephone by a Concerned Employee (sometimes referred to by the parties as a "Concerned Individual" or "CI") regarding the discrepancy in enhancements between heritage groups, and a case was opened.

130.    On October 15, 2011, Billie Garde, Deputy Ombudsman, reached out by electronic mail to Jeff Heller, BP associate general counsel, informing him that the Ombudsman had been contacted by a CI who raised concerns regarding "the inequity,

30

unfairness, and significant disparity between the retirement package deal for the Sohio heritage employees and the ARCO/Amoco employees." The CI further told the OoO that the disparity in retirement benefits was creating "morale issues" that were "turning into serious, potential[ly] safety significant, issues."

131.    On October 24, 2011, Mr. Heller informed Judge Sporkin that after conducting an internal and external legal review with ERISA counsel with expertise in pension issues, BP determined it satisfied the legal requirements at the time of the 1989 conversion.

132.    The Ombudsman conducted an extensive investigation and received various complaints from Concerned Individuals about the matter.

133.    On October 24, 2012, Fritz Guenther lodged a concern with the Ombudsman that the enhancements to ARCO/Amoco heritage employees were unfair to Sohio employees.

134.    On November 25, 2012, Walton Fujimoto provided a survey response to the OoO, indicating he was concerned that the enhancements to ARCO/Amoco heritage employees were unfair to Sohio employees.

135.    On October 27, 2012, Billie Garde sent an email to Clifford York seeking information that would enable the OoO to compare heritage Sohio employees' retirement benefits with those of other heritage groups.

136.    On November 15, 2012, Ms. Garde clarified with Mr. Heller that the OoO was not pursuing the legality of the conversion and was accepting BP's representations at face value that the actions taken were legal.

137.    In an electronic mail dated December 18, 2012, Mr. Heller told Ms. Garde that BP had "kept its pension promise to these Sohio heritage employees in all respects."

138.    On December 18, 2012, the OoO informed the Concerned Employees with whom it had been in contact that it had reviewed BP's legal analysis of their concerns and had concluded that BP's actions regarding other heritage groups' retirement benefits "were all within BP's rights and implemented in accordance with appropriate and controlling laws."

139.    On January 29, 2013, in an email, when a CI contacted John Mingé, President of BP America, about the length of time it was taking to complete the review of the inequity issue, Mr. Mingé urged employees to be patient while the OoO completed its review.

140.    In January 2013, Fritz Guenther bumped into Mr. Mingé at the airport, and Mr. Mingé urged Mr. Guenther to await the outcome of the OoO investigation.

141.    BP had a hotline known as "Open Talk" that allowed employees to call in to raise concerns, which were then forwarded to a BP case manager for response.

142.    On March 26, 2013, a Concerned Individual forwarded to the OoO a copy of an Open Talk response from BP wherein BP's case manager assured the CI on November 16, 2011, "[F]or the past 22 years BP has provided the heritage Sohio employees with the pension formula they were promised at conversion."

143.    On April 2, 2013, Mr. Heller told Pasha Eatedali, an investigator with the OoO, that the communication materials used in 1989 "did not promise any particular outcome or pension benefit." Mr. Heller asserted that the statements in the communications were not "promises, commitments or guarantees" and went on to state that "some now claim these are promises, commitments or guarantees, but legally they are not and more importantly those terms were not used."

144.    On April 19, 2013, Michael Brothers, a consultant used by Ms. Garde during

the investigation, who was an attorney and an engineer, indicated that employees had raised with him that they were told the BP RAP plan would be "as good or better than the SOHIO Original Plan." Utilizing his calculations, Mr. Brothers concluded there was an apparent pension disparity between the ARP and the RAP and attributed the failure of the promise to the decline in interest rates experienced since 1989 to the present. Specifically, Brothers stated that, "[b]ased upon the actual interest rates experienced between 1989 and the present, the BP RAP benefit is significantly less than the Sohio Original Plan."

145.    On April 19, 2013, Ms. Garde forwarded Mr. Brothers's materials to Mr. Heller. She informed Heller that the OoO was working on 12 primary questions, one of which was "the disparity allegations" concerning the difference between the ARP and the RAP.

146.    Ms. Garde experienced some medical issues, and the investigation was delayed.

147.    On June 17, 2013, a Concerned Employee sent an email to Cliff York asking him to explain why the RAP benefits appeared to be lower than represented at the time of the plan rollout. Mr. York responded, "Since your Sohio pension questions are currently being reviewed by the BP ombudsman (Judge Stanley Sporkin), I've been advised by BP Legal to direct you to his office for response."

148.    On July 16, 2013, Fritz Guenther inquired regarding the status of the investigation and was informed that the Ombudsman's report to BP was still being finalized.

149.    On August 29, 2013, Ms. Garde sent Mr. Heller an email asking if he disagreed with Mr. Brothers's disparity calculations and informing him this information was critical to the OoO's investigation conclusion.

150.    On August 30, 2013, Ms. Garde provided Mr. Heller with a "Q & A"

document to obtain BP's answers to specific questions.

151.    On September 19, 2013, Ms. Garde informed the Concerned Employees who had contacted the OoO that the OoO report was not yet final and that two of her staff, Noshad Abbassi and Pasha Eatedali, were becoming BP employees within the Employees Concerns Oversight team.

152.    On September 26, 2013, Mr. Heller expressed concern that a visit by Ms. Garde to Concerned Employees in Alaska would generate "fallout" for BP. Ms. Garde responded that she "was asked to meet personally with some Sohio [Concerned Employees] to give them an update on our investigation progress," something that she had "done in the past[,]" and that she had spoken to Stan Bennion, who worked in BP's Human Resources Department in Alaska, about the visit.

153.    On October 22, 2013, Mr. Heller responded to Ms. Garde's request to answer questions. In his email, Mr. Heller chastised the OoO for "believ[ing] it is empowered to address the subject of BP pension benefits" and for "delving into issues for which the Ombudsman has no real expertise or experience." Mr. Heller provided an analysis from BP's actuary, Mercer, pertaining to Kwasha Lipton's 1989 chart. Mercer merely confirmed that Kwasha Lipton's calculations were correct using the numbers Kwasha Lipton input. In its answers to the OoO's questions, BP maintained that "[t]he fact remains that Sohio employees have received a pension benefit that is consistent with both the governing plan terms and the formula described to them in the original communications."

154.    On February 21, 2014, after the OoO had submitted its report to BP management, Mr. Heller emailed Ms. Garde regarding suggested changes to the report. Mr. Heller took issue with the Ombudsman's proposed finding that, in most cases, the ARP plan was better and argued that portability made the RAP a better plan. Mr. Heller further

criticized the Ombudsman's proposed findings that "BP's use of an 8% interest rate in its communications to Sohio employees was not reasonable" and that "[a]n 8% interest rate was a high projection, based on a historical anomaly."

155.   On March 7, 2014, Judge Sporkin wrote to John Mingé, Chairman and President of BP America, Inc., about the OoO's investigation. In his letter, Judge Sporkin recommended that BP pay additional benefits to Sohio heritage staff, noting that "[t]here are several ways such benefits could be provided to those individuals as a non-qualified payment." Judge Sporkin further asserted that:

> The relevant facts of this matter are not in serious dispute. In 1989 BP made statements to the Sohio heritage employees that the RAP plan would provide "a retirement benefit that is comparable to—and in most cases, better than" the retirement benefit that they would have received under the prior pension formula. That prediction didn't come true over the long term, because the interest rate environment did not meet the hoped-for expectations.

> What is key here is that in the 1989 "conversion" there were certain risks that the new retirement plan presented. These risks included what would happen if the projected interest rates could not be sustained. This is what, in fact, occurred. The employees simply were not told that the risks associated with a decline in interest rates would be solely borne by the employees. Simply put, there would be no allocation of these risks.

156.   The Confidential Investigation Final Report for Case No. 2011-052 summarized the following conclusions. BP's RAP formula did not provide a comparable benefit to the prior pension formula because "the interest rate environment did not meet the hoped-for expectations." BP's "employees simply were not told that the risks associated with a decline in interest rates would be solely borne by the employees." To the contrary, the report concluded, "the statements made in the original promotional and explanatory materials stated that the risks would be borne solely by BP." Further, the report identified that, for the "employees who have stayed with BP the longest, their situations have not been comparable." The report recommended that BP calculate the pension benefits affected

employees would have received under the prior formula and that BP determine a realistic amount to offer these employees to bridge the difference, which could range between 50% and 100% of the original benefits.

157.   On March 13, 2014, Ms. Garde reported to the Concerned Employees that the OoO had submitted its final report, including its investigative findings and recommendations, to Mr. Mingé, President of BP America. Ms. Garde further wrote that "[t]he OoO has maintained an ongoing dialogue with BP about the Sohio issue and, prior to formally submitting the report, the Ombudsman Judge Sporkin and I traveled to Houston to meet with BP regarding our work." Ms. Garde described the Houston meeting as "productive" and added that she expected another meeting with "BP regarding our findings" to "take place soon."

158.   On March 21, 2014, Janet Weiss, President of BP Alaska, emailed Mr. Guenther, informing him that the Office of Ombudsman had given its report to Mr. Mingé, who forwarded it to BP management overseeing the Sohio matter. Mr. Guenther replied to this email on March 26, 2014, and expressed his appreciation for Ms. Weiss's interest.

159.   On March 28, 2014, a heritage Sohio employee named Todd Denman sent a draft of a filing to Ms. Weiss via email that Mr. Denman intended to submit to BP's Chief Ethics and Compliance Officer regarding what Mr. Denman alleged were violations of the BP Code of Conduct stemming from BP's handling of the pension issue. On April 7, 2014, Ms. Weiss responded to Mr. Denman's email, informing him that she believed that the Office of Ombudsman report was "a quality piece of work that is being reviewed and considered" and that "letting this process progress is a constructive way forward." On April 8, 2014, Ms. Weiss forwarded this email chain to BP attorney Helene Hall.

160.   Also, on April 7, 2014, Ms. Weiss responded to Mr. Guenther, informing

him, similarly, that the Ombudsman report was "a quality piece of work that is being reviewed and considered" and "that this progressing process is a constructive way forward."

161.    On May 8, 2014, Ms. Garde reported to the Sohio heritage employees that the OoO and BP had been in "continual contact" regarding the OoO's report since the report's submission in March of 2014 and that she and Judge Sporkin had had a "respectful meeting" in April of 2014 "with BP decision makers[.]" Ms. Garde explained that she "d[id] not yet know what BP's response w[ould] be to our recommendations[,]" nor could she say "when BP w[ould] make a determination on our recommendations[.]"

162.    The OoO met again with BP on July 24, 2014. They were unable to resolve the Sohio pension issue and agreed to meet again, tentatively in August of 2014.

163.    It is unclear from the record whether the OoO and Bp met in August of 2014. Ultimately, BP decided not to provide any additional benefits to the Sohio heritage employees.

164.    On September 5, 2014, Mr. Heller provided Ms. Garde with a proposed message to the Concerned Employees regarding BP's final decision. Ms. Garde expressed "a number of concerns" with Mr. Heller's draft letter, foremost among them that Mr. Heller's draft letter "d[id] not factually set forth [the OoO's] actual conclusions" and mischaracterized the OoO's report as being in agreement with BP. Ms. Garde further stated in her email that the draft letter's description of the shift to the RAP cash-balance program as "ultimately successful" was "insensitive" and "ignore[d] the facts—that BP's commitment did not work out for many of the Sohio" heritage employees.

165.    On September 15, 2014, and September 16, 2014, Mr. Heller and Ms. Garde exchanged often-heated emails regarding communications to employees about the

OoO's report and BP's decision. Mr. Heller took issue with the OoO's characterization of the 1989 conversion issues and requested language changes. For instance, Mr. Heller complained that "[t]he report should include some acknowledgement that BP specifically told Sohio employees that the projections of their pension future benefits were estimates based on assumptions and were not a promise of what the actual benefit under the plan ultimately would be." Ms. Garde indicated she and her law partner had "re-reviewed the two primary documents provided to the Sohio heritage employees in 1989, and did not find the representation that the words spoken were 'estimations based on assumptions.' As we have discussed throughout this review, the exact words used in the RAP brochure were quite clear: *The plan is designed to provide a retirement benefit that is comparable to— and, in most cases, better than—the benefit you would have received under the prior pension formula*." Ms. Garde further noted that there could not be changes to the report as it was complete, and BP had already reviewed and edited it.

166.    During the discussion of the Ombudsman's investigation, BP circulated a set of slides summarizing the pension issues. In these materials, BP acknowledged that interest rates lower than the originally forecasted 8% impacted the actual pension accruals among certain Sohio heritage employees. In these materials, BP reported that over 7,000 heritage Sohio retirees and employees were impacted by the conversion to the RAP.

167.    An "Ombudsman holding statement" was drafted, conveying that the highest levels of BP's organization reviewed the Office of Ombudsman findings.

168.    BP internally addressed the question of the Sohio employee discontent with retirement benefits. BP acknowledged that the "low interest rate environment" exacerbated the discontent of heritage Sohio employees.

169.    A communications plan was circulated within BP via email regarding the

Office of Ombudsman's report.

170.     On September 15, 2014, Mr. Mingé, still Chairman and President of BP America, Inc.., sent Concerned Employees who were still employed with BP a letter referencing the OoO review and indicating, "[W]e now communicate to you BP's final decision on the matter." Mr. Mingé expressed regret that "market conditions yielded an unexpected outcome for you. The 1989 change was consistent with the continuing trend in our industry toward cash balance-type plans. BP relied upon credible advisors in the development of the RAP program…." Mr. Mingé never informed employees that the OoO investigative report identified a potential discrepancy between the 1989 promise and actual retirement benefits.

171.     On September 19, 2014, Judge Sporkin prepared his own letter to "Dear Concerned Employee" and included a summary of the OoO's report findings.

172.     The Investigation Final Report Summary for Case No. 2011-052 concluded the RAP plan presented risks, including lower returns if projected interest rates could not be sustained, which were not relayed at the time of conversion. In fact, Judge Sporkin noted the materials were promotional and indicated BP America would bear the "full investment risk."

173.     On September 22, 2014, Mr. Mingé sent out an electronic message, which was linked to his earlier letter informing employees of BP's final decision.

174.     The Class did not have actual knowledge that BP would not honor its 1989 promise until Mr. Mingé communicated BP's final decision on September 15, 2014.

175.     In 2011, BP prevaricated about whether the 1989 promise of a comparable benefit was true by assuring those few employees with whom it communicated that they received the plan formula that was promised to them in 1989.

176.    In 2014, when communicating its final decision, BP did not forthrightly inform those employees with whom it was communicating that the 1989 promise of a comparable benefit was untrue.

177.    The September 9, 2014, letter from retired federal Judge Stanley Sporkin to Concerned Employees was the first time employees were forthrightly informed that the ARP benefit might be greater than the RAP benefit for some employees, contrary to BP's promise.

178.    It was not until the assessment of their expert in this matter, after a review of discovery materials, that any of the Plaintiffs had sufficient information to have actual knowledge that BP's promise was not true for the Class.

179.    One of BP's actions that constituted part of the breach, and/or one of BP's omissions, was the date BP made its "final decision" to not fulfill its promise that the RAP would be as good or better than the ARP:  the date Mr. Minge sent BP's "final decision" letter, September 15, 2014.  Plaintiffs filed their Complaint on April 13, 2016, well within six years of that date.

180.    There is no evidence the named plaintiffs had actual knowledge until their expert determined their loss based on discovery responses. Defendants previously admitted Plaintiffs could not have had actual knowledge until Plaintiffs actually retired and were able to calculate whether they would have done better or worse under the RAP verses the ARP.

181.    BP concealed all along it had no intent to fulfill its promise by enhancing the class members' benefits to be as good or better than what the class would have received under the ARP.  BP encouraged class members to engage in the Ombudsman process and await its outcome, and BP represented that it too was awaiting the outcome and at least implied that it would follow the OoO's recommendation. Ultimately, the evidence

indicates that BP never intended to follow the Ombudsman's recommendation if the Ombudsman found, as he did, that the employees' benefits should be enhanced to fulfill BP's promise.

### B. CONCLUSIONS OF LAW

1.    A participant's right to maintain an action for violation of a provision of ERISA arises exclusively under section 502(a), 29 U.S.C. § 1132, which specifies persons "empowered to bring a civil action," and identifies several such causes of action. *Massachusetts Mutual Life Ins. Co. v. Russell*, 473 U.S. 134, 139-140 (1985). Each of the first three actions listed in §1132(a) authorizes a participant to maintain an action.

2.    ERISA §502(a)(3), 29 U.S.C. §1132(a)(3), exclusively allows injunctive relief and other "appropriate equitable relief" to redress violations of ERISA or terms of the Plan. The civil action may be brought:

> by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan[.]

3.    ERISA §502(a)(3), 29 U.S.C. §1132(a)(3), "by its terms, only allows for *equitable* relief." *Great-W. Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 220–21 (2002) (emphasis in original); *see also CIGNA Corp. v. Amara*, 563 U.S. 421, 442 (2011) ("Section 502(a)(3) invokes the equitable powers of the District Court.").

4.    In 1989, under ERISA §204(h), 29 U.S.C. §1054(h), a Plan Administrator was required to issue notice when a plan change would result in a significant reduction in the rate of future benefit accruals. Section 204(h) is a mandatory notice provision under ERISA. The rule as in effect in 1989 required the §204(h) notice to be issued no less than 15 days before

the effective date of the plan amendment.

5.      Here, it is not disputed that BP failed to provide anything to participants 15 days before the effective date of January 1, 1989, the effective date of the amendment and restatement of the BP America Retirement Plan to the Retirement Accumulation Plan ("RAP" or "the Plan").

6.      The failure of BP to provide an ERISA §204(h) notice prior to January 1, 1989 was a violation of ERISA. Plaintiffs have demonstrated by a preponderance of the evidence that BP violated ERISA §204(h), 29 U.S.C. §1054(h)(1).

7.      In 1989, a Plan Administrator was required to issue an ERISA §102, 29 U.S.C §1022, Summary Plan Description ("SPD"). SPDs are central to ERISA. *Frommert v. Conkright*, 738 F.3d 522, 531 (2d Cir. 2013).

8.      SPDs are required to provide, among other things, the plan's requirements respecting eligibility for participation and benefits; a description of the provisions providing for nonforfeitable pension benefits; and circumstances which may result in disqualification, ineligibility, or denial or loss of benefits. 29 U.S.C. § 1022(b).

9.      SPDs are required to be furnished to participants and beneficiaries in a manner described in 29 U.S.C. §1024(b). 29 U.S.C §1022(a).

10.     SPDs must be written in a manner calculated to be understood by the average plan participant. 29 U.S.C §1022(a).

11.     SPDs must be sufficiently accurate and comprehensive to reasonably apprise participants and beneficiaries of their rights and obligations under the plan. 29 U.S.C §1022(a).

12.     Summaries of Material Modifications ("SMM") are also called for in this same section. 29 U.S.C §1022(a).

13.     SPDs and SMMs work in tandem: the SPD must "clearly identify" in an understandable manner all the "circumstances which may result in disqualification, ineligibility, or denial [or] loss of benefits" and the SMM must describe "any change" in those circumstances. 29 U.S.C. §1022(a), (b); 29 C.F.R. §§ 2520.102–3(1) and 2520.104b–3(a).

14.     Department of Labor regulations explain the role of SPDs and SMMs in accurately and accessibly educating participants about how their plan works. *See* 29 C.F.R.

§ 2520.102–2, 102–3. In fulfilling the requirements of ERISA § 102, fiduciaries are required to "exercise considered judgment and discretion by taking into account such factors as the level of comprehension and education of typical participants in the plan and the complexity of the terms of the plan." 29 C.F.R. § 2520.102–2(a). Consideration of these factors will usually require fiduciaries to limit or avoid "technical jargon" and include "clarifying examples and illustrations" of how the plan works in practice. *Id.*

15.     The regulations insist on a fiduciary's affirmative duty to make participants clearly "see" circumstances under which they will not receive the benefits described in the summary that they might otherwise reasonably expect to receive. The SPD thus must:

> [C]learly identif[y] circumstances which may result in disqualification, ineligibility, or denial, loss, forfeiture, suspension, offset, [or] reduction, or recovery ... of any benefits that a participant or beneficiary might otherwise reasonably expect the plan to provide on the basis of the description of benefits [provided elsewhere in the summary].
> 29 .F.R. § 2520.102–3(l).

16.     Underscoring this affirmative duty to warn participants of the circumstances when they might not actually receive benefits the summary otherwise seems to be telling them they can expect, the regulations specifically direct that "[a]ny description of exception, limitations, reductions, and other restrictions of plan benefits shall not be minimized, rendered obscure or otherwise made to appear unimportant." 29 C.F.R. §

2520.102–2(b); *see also id.* (requiring further that "[s]uch exceptions, limitations, reductions, or restrictions of plan benefits shall be described or summarized in a manner not less prominent than the ... prominence used to describe or summarize plan benefits"). Restrictive plan provisions must be clearly cross-referenced with the description of the benefit. *See id.*

17.    The regulations expressly forbid fiduciaries from either playing up the positive features of the plan or downplaying the negative: "[t]he advantages and disadvantages of the plan shall be presented without either exaggerating the benefits or minimizing the limitations." *Id.*; *see also id.* (warning that the format of the SPD "must not have the effect to misleading, misinforming or failing to inform participants and beneficiaries").

18.    The SPD must explain the "full import" of the plan's material terms. See *Layaou v. Xerox Corp.*, 238 F.3d 205, 211 (2d Cir. 2001); see also *Frommert v. Conkright*, 433 F.3d 254, 260 (2d Cir. 2006) (requiring an SPD to "set out in full" the plan's benefit calculation mechanics in a manner employees can appreciate); *Wilkins v. Mason Tenders Dist. Council Pension Fund*, 445 F.3d 572, 584 (2d Cir. 2006) ("Here, the Fund's SPD does not even mention the Policy, let alone explain its full import.  Obviously, it falls short of the high standards of clarity and completeness to which SPDs are held.").

19.    "[I]n addition to describing the individual provisions of the retirement plan and their import, an employer must also describe the interaction among those provisions if the result is likely to be material to plan participants." *Amara I*, 534 F.Supp.2d at 345 (citations omitted); see also *Layaou*, 238 F.3d at 209–11 (finding violation where SPD failed to warn employees about how an offset formula interacted with the plan's other formulas to reduce employees' benefits).

20.    BP failed to provide participants with an SPD regarding the 1989 plan

amendment and restatement.

21.     BP's failure to provide participants with an SPD regarding the 1989 plan amendment and restatement was a violation of ERISA §102, 29 U.S.C. §1022(a).

22.     BP filed to provide participants with a SMM regarding the 1989 plan amendment and restatement.

23.     BP's failure to provide participants with a SMM regarding the 1989 plan amendment and restatement was a violation of ERISA part 1 (§102, 29 U.S.C. §1022(a)).

24.     BP's written communications to participants of the Plan in the summer of 1989 did not satisfy the requirements of ERISA § 102(a), 29 U.S.C. §1022(a).

25.     BP's written communications to participants of the Plan in the summer of 1989 did not provide a "a statement clearly identifying circumstances which may result in

… denial, loss, forfeiture, … [or] reduction … of any benefits that a participant … might otherwise reasonably expect the plan to provide on the basis of the description of benefits [in the SPD]." 29 C.F.R. § 2520.102-3(l).

26.     BP's communications to participants of the Plan in the summer of 1989 included misleading and incomplete information and were not written in a manner reasonably calculated to be understood by the average plan participant.

27.     The information BP presented to Plan Participants in 1989 was not written clearly.

28.     The information provided—including comparisons to the benefits the previous formula provided—communicated to the participants that the RAP "is an innovative pension plan that provides retirement benefits participants can count on." These benefits were described as "comparable to- and, in most cases, better than- "the benefit you would have received under the prior pension formula." BP's related correspondence represented the

revised formula "preserved the principal strengths of the former plan…. [T]he plan provides a retirement benefit to career employees that is comparable to the fully competitive benefit under the prior formula."

29.    To reduce suspicion that the change might reflect a reduction in benefits, BP represented to participants that "[t]he revised plan is not a cost-cutting exercise."

30.    At the same time. BP told participants the changes had already been made, even though the amendments to the Plan were not reflected in a Plan document until they were adopted over six months later, on December 28, 1989. Whatever resistance to the changes might have been voiced was chilled by BP's representation that the changes had already been made and were effective nearly six months earlier, as of January 1, 1989.

31.    These actions taken together demonstrate by a preponderance of the evidence that BP violated ERISA part 1 (ERISA §102(a)).

32.    In addition to the specific notice and disclosure obligations ERISA imposes in Parts 1 and 2, the general standard imposed on a fiduciary informs the requirements imposed on a fiduciary's communications with participants about their benefits.

33.    ERISA §404, 29 U.S.C §1104, sets forth general fiduciary duty standards under ERISA.  It provides, in pertinent part:

(a)    Prudent man standard of care

(1)    Subject to sections 1103(c) and (d), 1342, and 1344 of this title, a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—

(A)    for the exclusive purpose of:

(i)    providing benefits to participants and their beneficiaries; and

(ii)    defraying reasonable expenses of administering the plan;

(B)    with the care, skill, prudence, and diligence under the
circumstances then prevailing that a prudent man acting in a like capacity and
familiar with such matters would use in the conduct of an enterprise of a like
character and with like aims[.]

29 U.S.C. § 1104(a); *see also Osberg v. Foot Locker, Inc.*, 138 F.Supp.3d 517, 550
(2015), *aff'd*, 862 F.3d 198 (2d Cir. 2017).

34.    "The Supreme Court has held that when an employer communicates with plan

participants about the contents of the plan, and when reasonable employees could have

thought that the employer was communicating with them both in its capacity as employer and

in its capacity as plan administrator, the employer is acting as a fiduciary under ERISA."

*Bouboulis v. Transp. Workers Union of Am.,* 442 F.3d 55, 65 (2d Cir. 2006) (citing *Varity*

*Corp. v. Howe*, 503 U.S. 489, 498 (1996) (internal quotation marks, brackets, emphasis, and

ellipsis omitted)).

35.    When an employer voluntarily chooses to communicate regarding the status of

an employee's benefits, it assumes such a duty to do so in a manner calculated to avoid

confusion and misunderstanding, whether by omission or commission. *Switzer v. Wal-Mart*

*Stores*, 52 F.3d 1294, 1298–99 (5th Cir. 1995).

36.    ERISA requires that the fiduciary with two hats wear only one at a time and

wear the fiduciary hat when making fiduciary decisions. *Pegram v. Herdrich*, 530 U.S. 211,

225–26 (2000).

37.    Providing information about likely future plan benefits falls within ERISA's

statutory definition of a fiduciary act. *McCall v. Burlington Northern/Santa Fe Co*., 237 F.3d

506, 510–11 (5th Cir. 2000), *cert. denied*, 534 U.S. 822 (2001).

38.    ERISA's fiduciary standards of conduct are "the highest known to the law."

*LaScala v. Scrufari*, 479 F.3d 213, 219 (2d Cir. 2007) (quoting *Donovan v. Bierwirth*, 680

F.2d 263, 272 n.8 (2d Cir. 1982)) (internal quotation marks omitted).

39.    Fiduciaries have an unswerving "duty of loyalty" that requires a fiduciary to

"discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries." 29 U.S.C. § 1104(a); *see also Harris Trust & Sav. Bank v. John Hancock Mut. Life Ins. Co*., 302 F.3d 18, 26 (2d Cir. 2002) (referring to this duty as a duty of loyalty).

40.     "To participate knowingly and significantly in deceiving a plan's beneficiaries in order to save the employer money at the beneficiaries' expense is not to act solely in the interest of the participants and beneficiaries." *Varity*, 516 U.S. at 506 (quotation marks omitted).

41.     As the Judge Forrest of the Southern District of New York has explained:

> ERISA § 404(a) also imposes a "duty of care" that requires fiduciaries to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). Prudence is "measured according to the objective prudent person standard developed in the common law of trusts." *Chao v. Merino*, 452 F.3d 174, 182 (2d Cir. 2006) (quoting *Katsaros v. Cody*, 744 F.2d 270, 279 (2d Cir.1984)).
>
> Proper execution of fiduciary duties requires that fiduciaries' decisions "be made with an eye single to the interests of the participants and beneficiaries." *Donovan v. Bierwirth*, 680 F.2d 263, 271 (2d Cir. 1982). Under ERISA § 404(a)(1), a fiduciary is not permitted to balance the interests of plan participants and the plan's sponsor: the focus on participants must be "exclusive." 29 U.S.C. § 1104(a)(1).
> *Osberg v. Foot Locker, Inc.*, 138 F. Supp. 3d 517, 551–52 (S.D.N.Y. 2015), *aff'd*, 862 F.3d 198 (2d Cir. 2017).

42.     BP chose to communicate with participants in 1989 regarding the participants' benefits and reasonable employees could have thought that BP was communicating with them both as employer and plan administrator.

43.     BP was acting as a fiduciary when it chose to communicate to Participants about their benefits under the RAP.

44.     BP communicated with participants in a manner in which it placed the company's interests above those of the participants in the plan.

45.    In failing to provide complete and accurate written explanations of the benefits available to RAP participants, BP breached its duties under ERISA § 404(a), 29 U.S.C. §1104(a).

46.    In providing inaccurate and incomplete explanations of benefits and information about the RAP conversion and drawing specific comparisons to the benefits provided previously by the ARP, BP breached its duties under ERISA § 404(a), 29 U.S.C. §1104(a).

47.    Plaintiffs have demonstrated by a preponderance of the evidence that BP planned for its Plan Participants to rely on its communications regarding the restatement and amendment of the Plan to the RAP, including the comparisons BP made to the benefits provided under the prior Plan formula, and BP specifically knew it shifted a number of financial risks to Plan Participants, to their detriment and to the advantage of BP.

48.    Plaintiffs have demonstrated by a preponderance of the evidence that BP obtained an undue advantage over Plan Participants when said Participants worked, year after year, with the mistaken belief that the benefit they would receive at retirement under the RAP formula would equal the benefit that they would have been provided under the prior ARP formula.

49.    Plaintiffs have demonstrated by a preponderance of the evidence that this mistaken belief by participants worked to the actual detriment of participants who reached retirement and later learned the benefit paid under the RAP was less than what they understood they were earning during their career with BP (and what the Participant would have earned under the ARP formula).

50.    Plaintiffs have demonstrated by a preponderance of the evidence that BP breached its fiduciary duties under ERISA § 404(a), 29 U.S.C. §1104(a).

51.    BP's ERISA violations are appropriately redressed by equitable relief under Section 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3). Plaintiffs have "show[n] by clear and convincing evidence that [BP] committed fraud or similarly inequitable conduct, and that such conduct caused [them] to be mistaken." *Turner v. Liberty Mutual Retirement Benefit Plan*, No. 20-11530, 2023 WL 5179194, at *9 (D. Mass. Aug. 11, 2023); *see also Amara v. CIGNA Corp.*, 775 F.3d 510, 525–26 (2d Cir. 2014).

52.    Plaintiffs have demonstrated by clear and convincing evidence that BP gained an undue advantage through the inequitable conduct described above, when BP violated ERISA parts 1, 2 and 4. Plaintiffs have demonstrated by clear and convincing evidence that BP gained an undue advantage of retaining its workforce by violating its fiduciary duty to communicate completely, accurately, and solely in the best interests of the Plan Participants when it chose to communicate with participants in 1989 regarding the Plan amendment and restatement and the Participants' benefits.

53.    Plaintiffs have demonstrated by clear and convincing evidence that BP violated its fiduciary duties to communicate completely, accurately, and solely in the best interests of the plan participants when it chose to market and "sell" the plan amendment and restatement to quell concerns from participants of a reduction in future benefit accruals.

54.    Plaintiffs have demonstrated by clear and convincing evidence that Plaintiffs and the class were harmed by working under a mistaken understanding caused by lack of proper information to inform them the benefits they would earn may be less than BP led them to understand was the case.

55.    Plaintiffs have demonstrated that they were mistaken about the terms of their employment agreement with BP due to BP's ERISA violations.

56.    Plaintiffs have demonstrated that BP's uniform communications and

misrepresentations concealed the true nature of the parties' agreement.

57.     Plaintiffs have demonstrated that BP undertook efforts to conceal the true nature of the parties' agreement.

58.     Plaintiffs have demonstrated by clear and convincing evidence that based on the nature of the communications and misrepresentations, there was class-wide reliance on BP's representations.

59.     Plaintiffs have demonstrated by clear and convincing evidence that BP's communications were uniform and given to participants.

60.     BP sought to avoid employee backlash and obtain acceptance of the new RAP plan.

61.     BP's misrepresentations resulted in class-wide mistakes about the terms of the RAP as compared with the ARP.

62.     BP has failed to demonstrate that the release on behalf of claimants in the *Nichols* matter bars Plaintiffs' claims under ERISA § 502(a)(3).

63.     BP has not satisfied its burden of proof on its affirmative defense. *Richardson v. Wells Fargo Bank, N.A.*, 839 F.3d 442, 448 (5th Cir. 2016)

64.     BP has failed to demonstrate that the parties are in privity. *Petro-Hunt, L.L.C. v. United States*, 365 F.3d 385, 395 (5th Cir. 2004).

65.     BP has failed to demonstrate that the claims of the class certified in this case are based on the same nucleus of operative facts as the claims brought in the *Nichols* matter. *Id.*

66.     The transactional test utilized in *Petro-Hunt* does not favor application of the res judicata doctrine as to the pending claims.

67.     BP has failed to demonstrate that Plaintiffs are required to pursue an

51

administrative claim regarding conduct giving rise to an ERISA §502(a)(3) claim.

68.     Exhaustion is measured at the time of the filing of the Complaint. *See Galvan v. SBC Pension Benefit Plan*, 204 Fed. Appx. 335, 340-41 (5th Cir. 2006).

69.     Exhaustion is not required to enforce statutory ERISA rights. *Id.* at 338–39.

70.     The claims asserted here are not "benefit" claims under ERISA 502(a)(1)(B). *See Milofsky v. Am. Airlines, Inc*., 442 F.3d 311, 313 (5th Cir. 2006) (en banc) (noting that fiduciary breach claims do not require exhaustion of administrative remedies).

71.     Before Plaintiffs filed their Complaint, the OoO thoroughly reviewed the communications BP made to Plan Participants at the time of the 1989 amendment and restatement of the ARP to the RAP and concluded that BP misled Plan Participants. The OoO recommended BP provide Plan Participants with relief consistent with upholding the promises BP made to Plan Participants at the time of these communications. BP rejected the OoO's proposal and subsequently dissolved its Ombudsman program. This was the first time BP had not followed the OoO's recommendation.

72.     At the time of the filing of the complaint, Mr. Guenther completed a formal administrative claim with BP America Inc.'s ERISA Claims and Appeals Office, and his claim for relief recommended by the Office of BP's Ombudsman was rejected. Mr. Guenther appealed that decision, and his appeal was again denied.

73.     BP's rejection of the OoO recommendations of Judge Stanley Sporkin, its rejection of Guenther's claim and appeal, and its continued refusal to acknowledge the relief requested pursuant to ERISA 502(a)(3) demonstrates further administrative efforts by Plaintiffs or the Class would be futile.

74.     Moreover, BP's denial of Mr. Guenther's administrative claim, as well as its rejection of any relief recommended by the Office of BP's Ombudsman, makes clear that any

administrative claims of Mr. Fujimoto and others would be futile. *See Taylor v. Prudential Ins. Co. of America*, 954 F. Supp. 2d 476, 483 (S.D. Miss. 2013) (finding futility established without requiring a showing of hostility or bias by the plan administrator); *see also Dozier v. Sun Life Assurance Co. of Canada*, 466 F.3d 532, 535 (6th Cir. 2006) ("Where as here a plaintiff has exhausted one claim but not another, he may demonstrate futility by showing that the two claims are so identical that the denial of one demonstrates with certainty that the other will also be denied.").

75.     BP has presented no evidence to this Court of a binding release that specifically releases any Plaintiff's or Class member's ERISA § 502(a)(3) claim.

76.     BP's argument that general releases can bar ERISA § 502(a)(3) claims would violate the anti-alienation provision of ERISA, 29 U.S.C. § 1056(d)(1).

77.     ERISA's anti-alienation provision, 29 U.S.C. § 1056(d)(1), makes void any release seeking to release vested benefits. *Rhoades v. Casey*, 196 F.3d 592, 598 (5th Cir. 1999).

78.     BP has failed to demonstrate that any exception exists to ERISA's anti-alienation provision, 29 U.S.C. § 1056(d)(1).

79.     BP has failed to demonstrate that any plaintiff or class member knowingly and voluntarily waived its vested retirement benefits as part of a release to reach a settlement. *See Rhoades*, 196 F.3d at 598.

80.     BP has failed to demonstrate that any Plaintiff or Class member intentionally relinquished or abandoned a known ERISA right or privilege as part of a settlement or release. *Matter of HECI Exploration Co., Inc.*, 862 F.2d 513, 523 (5th Cir. 1988).

81.     BP has failed to demonstrate that any Plaintiff or Class member who BP claims to have released their ERISA § 502(a)(3) claim received adequate consideration in doing so.

*Clayton v. ConocoPhillips Co*., 722 F.3d 279, 292 (5th Cir. 2013) (quoting *Williams v. Phillips Petroleum Co*., 23 F.3d 930, 935 (5th Cir. 1994)).

82.     BP has failed to demonstrate that any Class members have signed releases.

83.     The totality of the circumstances demonstrates that the releases BP had individuals sign were not intended to release ERISA § 502(a)(3) claims and do not release the claims asserted in this action. *O'Hare v. Global Natural Resources, Inc*., 898 F.2d 1015, 1017 (5th Cir. 1990).

84.     BP bears the burden of proving the release bars any Plaintiff's or Class member's claim. *Chaplin v. NationsCredit Corp*., 307 F.3d 368, 372 (5th Cir. 2002).

85.     BP has not demonstrated that the presence of a few releases, even assuming their existence, is fatal to the Class's ERISA § 502(a)(3) claims. *Cf. Langbecker v. Elec. Data Sys. Corp*., 476 F.3d 299, 313 & n.26 (5th Cir. 2007) ("[O]rdinarily the fact that up to nine thousand potential class members have signed releases of claims against EDS would defeat typicality and preclude class certification[.]").

86.     The Court concludes that Plaintiffs' action is timely. ERISA § 502(a)(3) does not include a statute of limitations and does not make reference to actions based on any particular sections or Parts of ERISA. Moreover, ERISA §502(a)(3), 29 U.S.C. §1132(a)(3), "by its terms, only allows for *equitable* relief." *Great-W. Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 220–21 (2002) (emphasis in original); *see also CIGNA Corp. v. Amara*, 563 U.S. 421, 442 (2011) ("Section 502(a)(3) invokes the equitable powers of the District Court.").

87.     The Supreme Court has "held that in suits seeking solely equitable relief, statutes of limitations do not apply." *Walker v. Epps*, 550 F.3d 407, 411 (5th Cir. 2008) (citing *Holmberg v. Armbrecht*, 327 U.S. 392, 396 (1946)). Accordingly, Fifth Circuit precedent

"stands for the proposition that wholly equitable actions are subject to the doctrine of laches, not statutes of limitations." *Walker*, 550 F.3d at 411 (citing *Environmental Defense Fund, Inc. v. Alexander*, 614 F.2d 474, 478 (5th Cir. 1980) and *Perry v. Allen*, 239 F.2d 107, 114 (5th Cir. 1956)); *see also United States v. Georgia Power Co.*, 474 F.2d 906, 923 n.22 (5th Cir. 1973) ("Traditionally, statutes of limitations do not control such purely equitable relief."); *Garrett v. Thaler*, 560 Fed. App'x 375, 384 n.5 (5th Cir. 2014) ("The Supreme Court has held that statutes of limitations do not apply to suits seeking solely equitable relief.").

88.     To establish laches, a defendant must show inexcusable delay that causes undue prejudice. *In re Ryan*, 88 F.4th 614, 628 (5th Cir. 2023). "Whether laches bars an action in a given case depends upon the circumstances of that case and is a question primarily addressed to the discretion of the trial court." *Id.* (quotation marks omitted). Under the circumstances of this case, the Court concludes that BP has failed to show either inexcusable delay or undue prejudice.

89.     Finally, the Court is unpersuaded by BP's contention that Plaintiffs cannot recover under ERISA § 502(a)(3) because they are "attempt[ing] to impose liability on the current plan sponsor [BP Corporation North America] for a breach of fiduciary duty alleged to have been committed by the prior plan sponsor [BP America, Inc.] while it was acting as a *de facto* fiduciary." Plaintiffs explain that they named BP Corporation North America as a defendant "to achieve the requested reformation" under ERISA § 502(a)(3) and further explain that they did not name BP America, Inc. because it is no longer a plan sponsor or a plan administrator and is accordingly in no position to effectuate the equitable relief that Plaintiffs seek.

90.     "[T]he entity on which liability is imposed through § 502(a)(3) need not in all circumstances be the exact same entity committing the acts leading to liability." *Amara v.*

*CIGNA Corp.*, 775 F.3d 510, 528 n.15 (2d Cir. 2014). As the Court has previously noted, the remedies sought in this lawsuit are equitable, and "the traditional purpose of equity is to redress wrongful conduct causing harm that would otherwise be uncompensated by a rigid interpretation of the law." *Id.* at 528. On this record, the Court sees no reason why liability under ERISA § 502(a)(3) cannot be imposed on a BP entity that is currently serving as plan sponsor for the actions of another BP entity that formerly served as plan sponsor. To conclude otherwise would subvert the traditional purposes of equity for the sake of pure corporate formalism.

---

## C. <u>CONCLUSION</u>

The Court finds that the plaintiffs are entitled to equitable relief under Section 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3). The parties are **ORDERED** to file supplemental briefs regarding the appropriate form of that equitable relief. Each side may file a brief **on or before May 1, 2024**, and each side may respond to the other side's brief **on or before May 15, 2024**.

SIGNED in Houston, Texas this 28th day of March 2024.

_George C. Hanks Jr_

GEORGE C. HANKS, JR.
UNITED STATES DISTRICT JUDGE